William C. CHAPMAN,
Plaintiff-Appellant,

v.

ORANGE RICE MILLING COMPANY,
and Edward J. Stine,
Defendants-Appellees.

No. 83–2653.

United States Court of Appeals,
Fifth Circuit.

Dec. 3, 1984.

McLaughlin, Hutchison & Hunt, J.D. McLaughlin, Paris, Tex., for plaintiff-appellant.

A.J. Gray, III, David R. Frohn, Lake Charles, La., for defendants-appellees.

Before GEE, POLITZ, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A lessor of a large tract of ranch land appeals from a take-nothing judgment following a bench trial in this Texas diversity action for breach of contract. While the district court found that the lessee had breached his lease by not clearing sufficient acreage, it held the contract claim barred by the applicable four-year statute of limitations. Persuaded of a different reading of the schedule for clearing under the lease, we conclude that the breach sued for came later than found by the district court, and that the lessor's claim was not time-barred. We reverse and remand.

I

William C. Chapman owns approximately 18,000 acres of wooded land in Red River and Bowie Counties, Texas. In June of 1967 he entered into a written ten-year lease of this tract with the president of Orange Rice Milling Company, Edward J. Stine.[1] Orange Rice Milling leased the land from July 1, 1967 to June 31, 1977 for farming and cattle ranching. As part of its consideration, Orange Rice Milling agreed that "[d]uring the ten (10) year period of the lease" it would "clear and keep cleared a minimum of 7,000 acres." According to the schedule set in the lease, "a minimum of 700 acres" would be cleared "each year during said term with a minimum of 4,000 acres cleared on or before July 1, 1970." Orange Rice Milling cleared 4,000 acres by July of 1970 as required, and both parties believed that the remaining acreage had been substantially cleared by the early 1970's. Orange Rice Milling vacated the property when its lease terminated in December of 1978.[2] In 1979, Chapman began leasing the land to others for farming. A March 1980 Department of Agriculture overfly map indicated that Orange Rice Milling had cleared only 5,226 acres of Chapman's land, 1,774 acres fewer than the contractual minimum. Chapman filed suit for breach of contract on May 21, 1980.

At the conclusion of the evidence, the district court requested legal memoranda on certain issues, including "[w]hether the matter of limitations applies in this case or not, and if so, how it applies." The district court then issued its findings of fact and conclusions of law, holding that Orange Rice Milling breached its lease by failing to clear 1,744 acres, damaging Chapman in the amount of $244,160. It went on to hold, however, that the defendant had

---

1. Stine personally guaranteed the lease obligation, and was sued along with his corporation. We do not distinguish between them in this opinion.

2. The initial lease period was extended by written agreement until December 31, 1978. No clearing was to be done during this final year.

"raised the affirmative defense of limitation during the course of the trial," and that the action was barred by Texas' four-year statute of limitations for suits on written contracts. Tex.Rev.Civ.Stat.Ann. art. 5527 (Vernon Supp.1984). The court entered a take-nothing judgment against Chapman.

## II

### –1–

In holding Chapman's contract claim barred by Texas' applicable statute of limitations, the district court read the lease schedule to require that Orange Rice Milling complete its 7,000 acre clearing obligation by July of 1975.[3] Reasoning that 4,000 acres were, as both parties agreed, cleared by July of 1970 as required, and that the lease also required a minimum of 700 acres to be cleared "each year thereafter," the contractual obligation mathematically had to be completely performed, and any breach established, by July 1, 1975. The district court held that as Chapman should have known of the termination of the defendant's clearing efforts and of any clearing deficiencies at that time,[4] his claim for breach of contract accrued, and the limitations period began to run, in July of 1975, some five and one-half years before suit was filed in May of 1980.

### –2–

Although this lease was ambiguous in its schedule for land clearing and extrinsic evidence of the parties' intent was admissible, no such evidence was offered.

3. Paragraph 5 of the lease provided that:
 During the ten (10) year period of this lease, the Lessee is to clear and keep cleared 7,000 acres in addition to the approximately 600 acres which are presently cleared on the leased premises .... The clearing is to be accomplished by the Lessee in accordance with the following schedule:
 (a) A minimum of 700 acres each year during said term with a minimum of 4,000 acres cleared on or before July 1, 1970.
4. Both parties testified that they each believed most of the clearing had been accomplished by the early 1970's. The district court indicated that "where there has been a mutual mistake, limitations begin to run against the injured par-

The district judge, in finding that the breach occurred in 1975, construed the lease within its four corners. Such an interpretative exercise presents a question of law, not fact, and our review is not limited by the clearly erroneous standard. *Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 995 (5th Cir.1983). Our judicial task is said to be "restricted to the interpretation of the contract as the parties made it for themselves." *Lion Oil Co. v. Gulf Oil Corp.*, 181 F.2d 731, 733 (5th Cir.1950). In so doing, we must abide by tenets of contract construction and seek to ascertain the true intentions of the parties by examining "*the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983) (emphasis in original). *See also Blaylock v. American Guarantee Bank Liability Insurance Co.*, 632 S.W.2d 719, 722 (Tex.1982); *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex.1980). We must honor the presumption that parties to a contract intend every clause to have some effect, and attempt to reconcile ambiguous provisions unless they are "irreconcilable," *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex.1983), or "necessarily repugnant." *Western Oil Fields, Inc. v. Pennzoil United, Inc.*, 421 F.2d 387, 389 (5th Cir.1970).

### –3–

We do not read the lease to require that as of July 1, 1970, a minimum of 700

ty from the time the mistake is discovered or could have been discovered by the exercise of reasonable diligence." As the defendant was contractually required to give Chapman thirty days written notice of the area to be cleared during any one year before commencing clearing operations, and as these notices ceased in July of 1975, the court reasoned, Chapman should have known that all clearing had halted at that time. The court reasoned further that Chapman's presence on the property "a few times per year" should have alerted him to any clearing shortages. Because we do not find that the lease was breached more than four years before suit, we need not review this finding.

acres would "thereafter" be cleared each year. The lease required Orange Rice Milling to clear at least 7,000 acres "during the ten (10) year period of this lease." It then scheduled such clearing in increments of "a minimum of 700 acres each year *during said term.*" (emphasis added). There is no "thereafter" in the contractual language. The trial court's insertion of this implicit deadline added an unintended term to the parties' contract. Construing the lease to require that all clearing be complete by July of 1975, at the end of eight years, does not give meaning to the provision that 7,000 acres be cleared "during the ten (10) year period of [the] lease." Nor can the requirement that a *minimum* of 700 acres be cleared *each* year be read, in harmony with other lease provisions, as a requirement that land be cleared in each year of the lease. Obviously, if 4,000 acres were to be cleared in the first three years of the lease, clearing 700 acres each year thereafter would require that some 8,900 acres be cleared, rather than the contracted for ceiling of 7,000 acres. We must attempt to harmonize "700 acres each year" with 4,000 acres by 1970, and 7,000 acres during ten years. This harmony is found by reading the lease to require a rate of clearing whereby the total acreage to be cleared at any given time was a multiple of the lease year and seven hundred, subject to the requirement that the lessee have created an initial "balance" of 4,000 cleared acres by July 1, 1970. Under this construction, by the eighth year a total of 5,600 acres were to be cleared, regardless of whether 700 acres were actually cleared each year. The lease schedule would thus ensure sufficient spreading of the clearing obligation so that the bulk of the clearing would not be deferred until the end of the lease.

 Thus, as we read the lease, Orange Rice Milling had until June 31, 1977 to clear the 7,000 acres. It was not until then that this obligation could have been breached

and the claim accrued. This suit was filed within three years of this date, in May of 1980. Under our construction, the lessee, by July 1, 1975, was arguably delinquent in the rate of clearing by some 374 acres (5600 acres required (8 × 700) minus 5,226 acres actually cleared). Yet, no claim was made or proof offered regarding any injury suffered by failure to maintain the prescribed rate of clearing as distinguished from a failure to clear at all the required number of acres. Whatever right the lessor had before May 1976, four years before suit was filed, to claim that any failure to maintain the rate of clearing was a source of injury or was in the nature of an anticipatory breach of an installment obligation sufficient to allow suit then for breach of the ultimate obligation to clear 7,000 acres, was never argued below or here, and we need not decide whether any such claim is barred. Chapman's sole claim was that 7,000 acres were not cleared by 1977, the last year under the lease.

 We read the lease just as the parties did at trial. While limitations, an affirmative defense, must be specifically pled or waived, *Morgan Guaranty Trust Co. of New York v. Blum,* 649 F.2d 342, 345 (5th Cir.1981),[5] it was never raised by the defendant. In its original answer, the defendant raised only equitable estoppel and laches in defense. Novation, waiver, and modification were alternatively advanced in its supplemental answer. Nor was limitations listed as a contested issue in the final pretrial order. The pretrial order stated that the only contested trial issues were whether the required 7,000 acres had been cleared, the amount of the alleged acreage deficiency, the damages sustained by Chapman, and whether Chapman had waived complete performance. In short, nothing in the record indicates that the parties intended that clearing be complete before the expiration of the ten-year term. In fact, Stine stated on cross-examination that he

---

**5.** While state law defines the nature of a defense in a diversity action, *Funding Systems Leasing Corp. v. Pugh,* 530 F.2d 91, 95 (5th Cir.1976), federal law "provide[s] the manner and time in which defenses are raised and when waiver occurs." *Morgan Guaranty Trust Co.,* 649 F.2d at 344.

recognized the lease contract required him "to clear seven thousand acres of land *during the term of the lease*," and that "[a]t the *conclusion of the initial lease*," he believed he had cleared that acreage. (emphasis added). Indeed, the time inquired about and testified to regarding cost to clear, was 1977. While the district court did find $140.00 to be the cost per acre of clearing "at the time of breach," and separately found the breach to have occurred in 1975, neither party offered any evidence of the cost to clear the land in 1975. Our reading of the record persuades us that the construction given the lease at trial, by all parties, was that it allowed the full ten-year term to complete the land clearing. Chapman's contention that the defendant waived the statute of limitations by failing to affirmatively plead the defense is thus irrelevant, as there was no defense to waive. Because the only arguable breach occurring outside the limitations period was never asserted, the district court erred in holding Chapman's action barred.

−4−

The district court, well aware of the difficulty of the issues, commendably sought the economy of a dispositive appeal by issuing findings of breach and damages in favor of plaintiff alternative to its conclusion that the claim was time-barred. However, consistent with its reading of the lease, the district court tied its damage findings to the cost to clear the land "at the time of the breach." Because there is no evidence to support a finding of the cost to clear the land in 1975 and because we find the sued-upon breach did not occur before June 31, 1977, the end of the primary lease term, the damages must be recomputed.

### III

■ In addition, while the district court awarded post-judgment interest on the alternate damage award at 9.98%, it did not address plaintiff's claim for pre-judgment interest. The right to pre-judgment interest as damages on unliquidated claims in Texas is a matter to be resolved in the first instance by the trial court. On remand the district court can consider Chapman's claim for pre-judgment interest, and for recomputation of damages based on a date of breach of July 1, 1977. The trial court may, in its discretion, choose to take additional evidence.

REVERSED and REMANDED.