FEDNAV (USA) INC. for Itself and as Successor in Interest to Fednav Lakes Services, Inc.,

v.

The UNITED STATES of America.

Civ. A. No. 90–1083–A.

United States District Court, E.D. Virginia, Alexandria Division.

April 7, 1992.

---

Lawrence C. Melton, Dempsey, Bastianelli, Brown & Tougey, Washington, D.C., for Fednav (USA) Inc.

Dennis Szybala, U.S. Atty., Alexandria, Va., for U.S.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This is a government maritime contract action. Plaintiff, Fednav (USA) Inc. ("Fednav"), contracted with the Navy over a three-year period for the ocean transportation of military cargo between ports of the Great Lakes and East Coast of the United States and various European ports, including Bremerhaven, Germany. At issue under these contracts is whether "Kajegebuhr," a port charge levied by the Port of Bremerhaven, must be borne by Fednav, as the carrier, or by the Navy, as the shipper. During the relevant period, Fednav paid the Port of Bremerhaven $143,725 in Kaje-

gebuhr charges and thereafter sought reimbursement for these charges from the Navy under the contracts. The contracting officer denied the reimbursement claim and Fednav has appealed this decision under the appropriate provisions of the Contract Disputes Act, 41 U.S.C. §§ 603, 609.

Consistent with the Court's duty to review the matter *de novo*, a hearing was held at which the parties offered documentary and testimonial evidence. Recorded here are the Court's findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P.

### Facts

Fednav is a Delaware corporation. In April 1986, it merged with the succeeded Fednav Lakes Services, Inc., also a Delaware corporation. These entities are collectively referred to hereafter as "Fednav".

The Military Sealift Command ("MSC") is the component of the Department of the Navy responsible for the procurement of ocean transportation services for the Department of Defense, the military departments and all of their components. The Military Traffic Management Command ("MTMC") is the component of the Department of the Army responsible for utilizing transportation services provided by MSC and for loading and unloading defense cargo to and from vessels.

From approximately April 1985 to March 1988, Fednav was a common carrier engaged in the business of transporting cargo in two roll-on/roll-off ("RORO") type U.S.–flag vessels named FEDERAL LAKES and FEDERAL SEAWAY between the ports of the Great Lakes and East Coast of the United States and the Port of Bremerhaven, Germany, and other ports in Northern Europe and the United Kingdom. During this period, MSC procured ocean transportation services from Fednav and other carriers operating U.S.–flag vessels over many different trading routes by the use of the competitive negotiation procedures set forth in the Federal Acquisition Regulations, 48 C.F.R. § 1501.000, *et seq.* (1991). Pursuant to these regulations, MSC issued semi-annual requests for pro-

posals, seeking offers of freight rates on a volume basis (per measurement ton of cargo) for the carriage of cargos shipped by MTMC. The rates were offered and accepted for semi-annual periods beginning April 1 and October 1 of each year. Six contracts for the ocean transportation of military break bulk cargo were awarded to Fednav.[1] The terms of the contracts are set forth in documents referred to as the Military Sealift Command Shipping Agreement ("Agreement"). The Agreement involves service between many different geographic areas, called route indexing. A route index denotes the geographic parameters of departure and destination point for a given service. The action at bar involves the ocean transportation of military cargo on Route Indices 05 and 17, namely between ports on the East Coast and Great Lakes of the United States and the Port of Bremerhaven, Germany.

The Agreement provided for what is known as Free In and Out Service. Under this service, Fednav, as carrier, was responsible for transporting the cargo from the port of departure to the destination port. Once the vessel arrived at the destination port, all work relating to loading, discharging and storage of cargo was the responsibility of the Navy, as the shipper. The Navy performed this function by contracting with Bremerhaven's port operator, Bremen Lagerhaus–Gesellenshaft ("BLG"). As the port operator, BLG was responsible for the port facilities used for loading and unloading cargo. BLG published a tariff under which it charged fees for its services. BLG's fees, as well as other stevedoring fees associated with loading, unloading and storing cargo carried by Fednav, were paid by the Navy under the Agreement.

Bremerhaven's port authority, Hansestadt Bremishes Amt ("HBA"), assessed certain port charges against vessels using the port. Pertinent here are the port charges, unique to Bremerhaven, labeled collectively as "Hafengeld" and individually as "Raungebuhr," "Kajegebuhr" and "Liegegeld." [2] Vessels loading or unloading cargo at Bremerhaven were charged with Kajegebuhr and Raungebuhr, the latter a charge based on the vessel's tonnage and the former a charge based, in part, on cargo tonnage loaded or unloaded.[3] Vessels using Bremerhaven's facilities, but neither loading nor unloading cargo, were charged the Liegegeld, a berthing charge based on vessel tonnage.

The focus of the instant dispute is the Kajegebuhr. Fednav paid $143,725 in Kajegebuhr charges to Bremerhaven over the three year period (1985–1988) the Agreement was in effect. When Fednav's vice president for Europe learned about the Kajegebuhr charge in 1985, he directed a subordinate to contact MSC concerning possible reimbursement. The subordinate was told the charge was for the ship's account and therefore Fednav's responsibility and not reimbursable. Fednav, through an agent or related entity, thereafter paid the Kajegebuhr charge without protest. Not until December 1988, well after the completion of contract performance, did Fednav file a formal claim for reimbursement of the $143,725 paid in Kajegebuhr charges. The contracting officer, concurring with MSC, denied the claim and Fednav has appealed this decision.

**1.** Specifically, the six contracts and the corresponding requests for proposals are identified as follows:

| RFP | CYCLE | PERIOD | CONTRACT |
| --- | --- | --- | --- |
| 1900 | 2nd | 04/01/85–09/30/85 | N0003385C8006 |
| 2000 | 1st | 10/01/85–03/30/86 | N0003386C8005 |
| 2000 | 2nd | 04/01/86–09/30/86 | N0003386C8005 |
| 2100 | 1st | 10/01/86–03/30/87 | N0003387C8005 |
| 2100 | 2nd | 04/01/87–09/30/87 | N0003387C8005 |
| 2200 | 1st | 10/01/87–03/30/88 | N0003388C8005 |

**2.** Fednav's Exhibit 7 is an English translation of the portions of the Bremian Port Law defining these charges.

**3.** Another factor used to compute the Kajegebuhr charge is the length of the voyage.

At trial, the parties sought, with more or less success, to clarify the nature and meaning of Kajegebuhr. Fednav's president expressed the view that Kajegebuhr is a "wharfage charge" or "quay due" chargeable against the cargo, not the ship. He conceded, however, that he only learned of Kajegebuhr in late 1987 and that this charge was not taken into account by Fednav in setting the price or fee to be charged under the Agreement.

Far more persuasive on the meaning and nature of Kajegebuhr was the testimony of Ingulf Piorkowski, Head of the Division of Ports[4] for the State of Bremen.[5] In his position, Mr. Piorkowski, *inter alia*, is responsible for developing and administering port policy, enforcing port laws and regulations and assessing and collecting port dues and charges. Noting that Kajegebuhr is a technical term, not a common German word, he stated convincingly that it was a charge for the use of the port assessed against the ship, not against the cargo. According to Mr. Piorkowski, if a vessel fails to pay the Kajegebuhr, the port authority will seek recovery from the vessel owner and, if unsuccessful, seek then to seize or arrest the vessel. He further testified that since the inception of Kajegebuhr in 1923, the State of Bremen has consistently defined and applied it as a charge against the vessel for the use of the port, not as a charge against the cargo for cargo handling. He also explained that simply because the amount of Kajegebuhr is a function, in part, of cargo weight does not mean that the charge is assessed against the cargo.[6]

Mr. Piorkowski's credentials to testify on the meaning, nature and application of Kajegebuhr are impeccable. His testimony on these matters was completely convincing, as it was authoritative, credible[7] and consistent with the English translations of the pertinent portions of Bremian port law.[8] The Court, therefore, accepts Mr. Piorkowski's testimony on Kajegebuhr and accordingly concludes that it is a port charge assessed against the ship, not the cargo, and that it is immaterial to the true nature of the charge that its magnitude depends in part on cargo tonnage.

### Analysis

■ The genesis of this dispute is the absence of any explicit reference to Kajegebuhr in the Agreement. This absence is hardly surprising in an Agreement intended to cover numerous port cities, each of which might well have its own schedule and terminology for port and cargo charges. In any event, the fact that the Agreement does not explicitly refer to Kajegebuhr does not mean that the Agreement is wholly silent on this subject. The inquiry concerning the parties' intent as to Kajegebuhr does not end with acknowledging the absence of an explicit reference to the charge. Instead, it is axiomatic in these circumstances that it is appropriate and necessary to inquire whether the over-

---

**4.** Mr. Piorkowski's specific job title is Senatsrat for Ports, Shipping and Transportation for Bremen. The highest authority for Ports, Shipping and Transportation is the Senator who is elected by Bremen's Parliament. Mr. Piorkowski reports to the Senator's deputy.

**5.** The State of Bremen consists of two cities, the City of Bremen and The City of Bremerhaven. All of the ports in the State of Bremen, those in the City of Bremen, and those in Bremenhaven, are administered under the Division of Ports.

**6.** In giving this testimony, Mr. Piorkowski noted that he agreed with Dr. Platz, a former Head of the Bremenhaven Port, who, in an article for a technical journal (defendant's Exhibit 24) had written that Kajegebuhr is chargeable to the vessel, not the cargo and that "it is unimportant that the calculation of the quay dues [Kajege-

buhr] is based on the weight of the cargo." Platz, *Wesserlots*, No. 24 (1957).

**7.** Significantly, the record reflects no evidence of possible bias on Mr. Piorkowski's part. He is not retained by either party and has no interest in the outcome of this contract dispute.

**8.** The applicable provisions of the port law, as translated into English, state that the port dues are for the use of the harbors, ports, docks, the river installations and Geeste River. *See* Defendant's Exhibit 7, Section 9. These provisions further state that port dues consist of tonnage dues, berthage and the quayage (Kajegebuhr). Nowhere in the laws or regulations does it state that Kajegebuhr is related to cargo handling. The law further states that the shipowner is the party liable for the charge. *See* Defendant's Exhibit 7, Section 13.

all scheme or structure of the contract provides convincing clues as to the parties' intent on a point not explicitly mentioned. *See Eastern Gas and Fuel Ass'n v. Midwest–Raleigh, Inc.,* 374 F.2d 451 (4th Cir.), *cert. denied,* 389 U.S. 951, 88 S.Ct. 333, 19 L.Ed.2d 360 (1967) (court must ascertain intent of the parties from the entire language of the contract); *Greenberg v. Service Bus. Forms Indus., Inc.,* 882 F.2d 1538 (10th Cir.1989) (same), *cert. denied,* 493 U.S. 1045, 110 S.Ct. 843, 107 L.Ed.2d 838 (1990); *Chapman v. Orange Rice Mill. Co.,* 747 F.2d 981 (5th Cir.1984) (same). The precise question in this context is whether the Agreement's general scheme for the division of costs and responsibilities between the parties sheds light on how the parties intended to treat Kajegebuhr. It certainly does. The Agreement's overall scheme for the division of costs is found in Article I:5 and Article I:6. The former is an extensive statement of the Navy's responsibilities for the loading and discharging of cargo, while the latter concerns Fednav's responsibilities as carrier. Simply put, these provisions establish that Fednav, as carrier, pays all port charges that are "properly for the account of the vessel", *see* Agreement, Art. I:6,[9] while the Navy, as shipper, pays all costs relating to cargo loading, stowing and discharging. *See* Agreement, Art. I:5.[10] Given this general scheme for the division of cost responsibilities, it follows that Kajegebuhr, as a port charge "for the account of the vessel", is chargeable against Fednav, as the carrier, and not against the Navy, as the shipper.

This conclusion finds further support in Article I:7 of the Agreement, which elaborates on the general scheme for the division of costs set forth in Article I:5 and Article I:6. In particular, Article I:7 notes that the parties, seeking to facilitate the administration of the Agreement, have listed in Appendix B certain specific cost items anticipated to arise during performance of the Agreement and the identity of the party responsible for each of those cost items.[11] Thus, Section 1 of Appendix B states that the carrier is responsible for certain specific costs, including (i) "[d]ues, fees, ... assessed against the vessel", and (ii) "[h]arbor and quay dues chargeable to ship." Appendix B, § 1(a)(5), (7). Kajegebuhr comfortably fits within these specific cost items. It does not fit within any of the cost items listed in Section 2 of Appendix B as the Navy's responsibility. Thus, Kajegebuhr charges do not, as Fednav contends, constitute (i) "[c]ustoms and other fees, dues ... chargeable to cargo", (ii) "[h]arbor and quay dues chargeable to cargo" or (iii) "[w]harfage or top wharfage assessable on military cargo". Appendix B, § 2(b)(6), (7), (9). Also worth noting is that the overall division of cost responsibilities in Exhibit B is completely consistent with the division of cost responsibilities reflected in Article I:5 and I:6. The port charges and other expenses listed as the carrier's responsibility under Appendix B, § 1, like those described in Article I:6, all relate to the operational costs of the vessel in transporting the cargo. These charges and expenses are chargeable to the vessel in connection with the carrier's obligation to transport the cargo from the point of

**9.** Article I:6 of the Agreement states as follows: "The carrier shall pay all port charges, canal tolls and similar charges (properly for the account of the vessel) including such charges assessed at Government installations. (For exceptions see paragraph 7, Section II)."

The parenthetically referenced exceptions in paragraph 7 of Section II are irrelevant here as they relate only to certain St. Lawrence Seaway Authority tolls to be borne by the shipper rather than the carrier.

**10.** Article I:5 of the Agreement states, in pertinent part:

[T]he Government ... shall bear all expenses of loading, stowing and discharging the cargo, such as lighterage (including loading and dis-

charging costs in connection therewith), stevedoring, checking, tallying, manifesting, winchmen, heavy lifts, dumping and trimming and removal of strong backs with shore equipment when the use of shore equipment is not necessitated by a structural or mechanical defect in the vessel.

**11.** Article I:7 provides that "[d]eterminations of responsibility for specific items of cost agreed to by the parties under this Article are to consistent with the general language of ARTICLES I:5 and I:6, provided, however, in the event of conflict, the specific language of Appendix B shall prevail."

leaving the origination port to the point of tying up at the destination port. By contrast, the costs responsibilities listed for the shipper in Appendix B, § 2, like those in Article I:5, all relate to cargo handling, namely the loading and discharging of cargo. In sum, then, an analysis of Article I:5 and I:6 and Appendix B points convincingly to the conclusion that the Kajegebuhr charge is Fednav's responsibility.

Nor is this conclusion contradicted or undermined by the fact that the Kajegebuhr charge is calculated, in part, on the basis of cargo tonnage loaded and unloaded. This fact reflects nothing more than that the cargo tonnage loaded and unloaded offers a convenient basis for calculating Kajegebuhr. It does not change the central fact that Kajegebuhr is a port charge unrelated to cargo handling that is assessed against the vessel, not the cargo.

 The foregoing analysis of the Agreement is sufficient, by itself, to warrant the conclusion reached here that Kajegebuhr is a port charge assessed against the vessel and hence Fednav's responsibility. Beyond this, however, the Navy argues that Fednav's performance under the Agreement—specifically Fednav's payment of Kajegebuhr for three years without protest—establishes a course of dealing between the parties that is entitled to great weight in divining the parties' intent as to who was to bear responsibility for Kajegebuhr under the Agreement. It is, to be sure, well-settled that the interpretation parties place on a contract before a dispute arises is entitled to great weight. *See Reconstruction Finance Corp. v. Sherwood Distilling Co.*, 200 F.2d 672 (4th Cir.1952); *Gurney Indus., Inc. v. St. Paul Fire and Marine Ins. Co.*, 467 F.2d 588 (4th Cir. 1972); *Ocean Transport Line, Inc. v.*

*American Philippine Fiber Indus., Inc.,* 743 F.2d 85 (2d Cir.1984).[12] Thus, the fact that Fednav paid the Kajegebuhr without protest from 1985 until at least late 1987 is consistent with and corroborative of, the conclusion reached here. Put another way, the parties' performance under the Agreement points persuasively to the same result reached on the basis of the analysis of the Agreement's terms and structure, namely that the parties intended that Kajegebuhr, a quayage or port charge assessed against the vessel, not the cargo, was to be the carrier's responsibility.[13]

Fednav's various contrary arguments are all unavailing. First, Fednav argues that Kajegebuhr is "wharfage" or "top wharfage" chargeable to military cargo. As one of Fednav's witnesses conceded, wharfage is typically a charge against the cargo for the use of the pier area needed to land or store the cargo. This is not Kajegebuhr. Unlike wharfage, Kajegebuhr is not chargeable to the cargo and it is not a charge for the use of the pier area to land or store cargo. Instead, it is a port charge against the vessel, a user fee for the privilege of tying up at the port's quay. Any charge for the use of that portion of the pier on which the cargo is landed or stored is a BLG charge, not a port charge, for it is BLG that is responsible for all facilities related to cargo handling, including the pier area or quay surface on which cargo may be landed or stored.

Next, Fednav argues that regulations of the Federal Maritime Commission ("FMC") define "wharfage" in a manner that would encompass Kajegebuhr. This argument is infirm in several respects. First, the FMC regulatory definition has nothing to do with this case; it does not apply to foreign

**12.** The Agreement, it is worth recalling, is actually a series of separate contracts, one for each year, but all containing the same operative provisions. It is also well-settled that the parties' performance under previous contracts containing the same provisions is strong evidence of the parties' intent with respect to the meaning and effect of those common provisions. *See Allied Paint Mfg. Co. v. United States,* 470 F.2d 556, 200 Ct.Cl. 313 (1972); *Blanchard v. United States,* 347 F.2d 268 (Ct.Cl.1965). *See also Cresswell v.*

*United States,* 173 F.Supp. 805, 811–812 (Ct.Cl. 1959) (plaintiff's performance of an earlier and identical contract according to defendant's construction of the contract terms was strong evidence of the parties' interpretation of the disputed terms).

**13.** Consistent with this conclusion is Fednav's concession that in bidding the Agreement, it made no assumption concerning which party would pay Kajegebuhr.

ports like Bremerhaven or to carriers like Fednav. Rather, the definition is specifically limited to the filing of terminal tariffs by entities carrying on the business of furnishing wharfage, dock, warehouse or other terminal facilities within the United States or its territories. *See* 46 C.F.R. § 515.1 (1991). Quite apart from this, the regulatory definition of wharfage does not fit Kajegebuhr, which, contrary to the definition, is not "a charge assessed against the cargo or vessel on all cargo passing or conveyed over, onto, or under wharves ... solely ... for use of the wharf...." 46 C.F.R. 515.6(d)(2) (1991).

In summary, this Court concludes that Kajegebuhr, as a port charge for the vessel, is chargeable to Fednav, as the carrier, and not to the Navy, as the shipper.

An appropriate Order will enter.