Lonnie PARRETT and Max C. Hughes, Suing on Behalf of Themselves and All Other Persons Similarly Situated, Plaintiffs–Appellants,

v.

The AMERICAN SHIP BUILDING COMPANY; the Huntington National Bank of Northeast Ohio; the American Ship Building Company Pension Committee; Richard Casserly, Roy F. Walker, Stanley J. Lepkowski, and Robert T. Buffenbarger, as Administrators of the Pension Plan for Employees of The American Ship Building Company, Defendants–Appellees.

No. 92–3199.

United States Court of Appeals, Sixth Circuit.

Argued March 9, 1993.

Decided and Filed April 12, 1993.

---

Robert A. Nagy, Elyria, OH, Richard D. Panza, William F. Kolis, Jr. (briefed), Richard A. Naegele (argued and briefed), Wickens, Herzer & Panza, Lorain, for Lonnie Parrett.

Robert A. Nagy, Elyria, OH, Richard D. Panza, William F. Kolis, Jr. (briefed), Richard A. Naegele (argued and briefed), Wickens, Herzer & Panza, Robert D. Gary, Lorain, OH, for Max C. Hughes.

Julius R. Gerlack, Samuel R. Martillotta, Jeffrey M. Embleton (argued and briefed), Mansour, Gavin, Gerlack & Manos, Richard H. Bamberger, Baker & Hostetler, Cleveland, OH, for American Ship Building Co.

Irene C. Walker (argued and briefed), Hugh M. Stanley, Jr., Arter & Hadden, Cleveland, OH, for Huntington Natl. Bank, as Trustee of Pension Plan.

Irwin S. Haiman, Norman S. Buckvar, McCarthy, Lebit, Crystal & Haiman, Cleveland, OH, for American Ship Building Co. Pension Committee, as Administrator of the Pension Plan.

Julius R. Gerlack, Samuel R. Martillotta, Jeffrey M. Embleton (argued and briefed), Mansour, Gavin, Gerlack & Manos, Irwin S. Haiman, Norman S. Buckvar, McCarthy, Lebit, Crystal & Haiman, Cleveland, OH, for Richard Casserly, Stanley J. Lepkowski, Robert R. Buffenbarger, Roy F. Walker.

Before: JONES and GUY, Circuit Judges; and COHN, District Judge.[*]

PER CURIAM.

Plaintiffs, a class of former employees of The American Ship Building Company, appeal summary judgment for defendants in this Employee Retirement Income Security Act (ERISA) action in which plaintiffs seek approximately $3,500,000 that had accumulated by reason of actuarial error in an employee pension plan by the time the plan was terminated and liquidated. The district court found that pursuant to 29 U.S.C. § 1344(d)(1) the employer could recover the residual assets of the plan after all benefits had been paid to employees, because the plan contemplated such action. We affirm.

## I.

In late 1983, The American Ship Building Company (AmShip) closed its last shipyard on the Great Lakes. Soon thereafter, the company's pension committee, comprised of three representatives each from the company and from the employees' union, approved a resolution terminating the pension plan. Plan participants then received either a lump sum check or certificates indicating coverage purchased under a guaranteed, fully insured annuity contract. After full distribution of benefits, over $3,500,000 of excess funds remained. That money was released to AmShip. The legality of that distribution to AmShip is at the center of this litigation.

The original pension plan was executed on May 8, 1962. Section 6.1 of the plan required AmShip to contribute "an amount equal to the sum of five cents (5¢) for every hour worked for the Company by bargaining unit Employees," pursuant to the terms of the 1961 collective bargaining agreement between AmShip and several unions which represented various bargaining unit employees. Section 6.2 of the plan stated that "[d]eposits by [AmShip] with the Trustee of payments computed in accordance with this Article shall be in complete discharge of the Company's financial obligation under this Plan." Three sections of the plan detail how the plan's assets are to be preserved to ensure that employee benefits are provided for. They state:

### ARTICLE VIII

### *MISCELLANEOUS PROVISIONS*

. . . .

---

[*] Honorable Avern Cohn, United States District Court for the Eastern District of Michigan, sitting by designation.

*Section 8.4.* The sole source of payment of benefits shall be the Pension Fund; benefits will be paid to Employees retired under the Plan from such Pension Fund for as long as the Plan continues in full force and effect with respect to the Unions; that while the Plan so continues in full force and effect with respect to the Unions, the Company will contribute to such Pension Fund but will not so contribute on and after its termination; that none of the funds contributed will revert to the Company but will, in the event of the Plan's termination, be allocated equitably with respect to active and retired Employees who are or were included in the bargaining unit or other Employees to which the coverage of the Plan extends.

## ARTICLE IX

### *AMENDMENT OR TERMINATION OF PLAN*

. . . .

*Section 9.3.* Subject to the provisions of Section 9.1 hereof, the Company and the Committee may jointly at any time and from time to time amend, in whole or in part, any or all of the provisions of the Plan by notice thereof in writing delivered to the Trustee and to the Unions covered by the Plan, provided that no such amendment shall authorize or permit, at any time prior to the satisfaction of all liabilities with respect to the Plan, any part of the Pension Fund to be used for or diverted to purposes other than for the exclusive benefit of the persons covered by the Plan. No such amendment shall have the effect of retroactively changing or depriving Employees of rights already accrued under the Plan, provided that any amendment may be made retroactively which is necessary to bring the Plan into conformity with governmental regulations in order to qualify or maintain the qualification of the Plan for tax exemptions.

## ARTICLE X

### *TERMINATION*

. . . .

*Section 10.3.* Anything in this Plan which might be construed to the contrary notwithstanding, however, it shall be impossible at any time prior to the satisfaction of all liabilities with respect to Employees under the Plan for any part of the corpus or income of the Pension Fund to be used for, or diverted to, purposes other than for the purposes herein stated. Any monies or property remaining in the Pension Fund because of an erroneous actuarial computation and after the satisfaction of all fixed or contingent liabilities or obligations to persons entitled to benefits from the Pension Fund shall be distributed to the Company.

In 1968, the pension committee issued a document summarizing the plan for its participants. The plan summary sought to "explain the principal provisions of the [plan]." Articles 6, 8, and 9 of the plan were explained as follows:

FUTURE CHANGES IN THE PLAN

The Company and the Committee expect that this Plan will be permanent, but reserve the right to amend or discontinue it at anytime. If it should become necessary to discontinue the Plan, the funds of the Trust will be applied exclusively for the benefit of employees, first, to provide benefits to pensioners for their remaining lives, and second, to provide benefits, to the extent possible, to other employees potentially eligible under the Plan. Under no circumstances can any Trust Funds revert back to the Company.

The language in the plan summary changed in 1970. In pertinent part, the changed summary stated: "Under no circumstances can any Trust Funds revert to the Company prior to the satisfaction of all liabilities with respect to employees' accrued benefits under the Plan." The same language appeared in the 1973 version of the plan summary. Finally, in the 1980 summary, this section was omitted entirely. In its place, in a portion of Article X entitled "Cautions About Your Benefits," the plan summary asserted that if the plan

terminated, "all Plan assets will be allocated for the retirement or death benefits of the affected participants as required by. law. The benefits of participants become fully vested and nonforfeitable to the extent funded upon termination or partial termination."

Through the years, several amendments were made to the original plan. In 1969, AmShip and the unions involved in the creation and maintenance of the plan agreed through collective bargaining to change the method of funding the plan by replacing AmShip's original five cents per hour contribution, which defendants labeled "actuarially inflexible," with an actuarial-based obligation. The plan's original structure as a defined benefit pension plan was retained, but AmShip was allowed to fund the plan on a "sound actuarial basis." Thus, the collective bargaining agreement declared that the plan would be amended "to provide that the Company will make all contributions to the trust fund which are necessary to fund Plan benefits on a sound actuarial basis."

The plan was amended and restated in its entirety in 1970 to reflect the changes made by the 1969 collective bargaining agreement, but the relevant sections regarding treatment of excess funds upon termination were not materially altered. However, additional language was added to the conclusion of section 8.4 so that it read, in its entirety:

Section 8.4. The sole source of payment of benefits shall be the Pension Fund; benefits will be paid to Employees and former Employees retired under the Plan from such Pension Fund for as long as the Plan continues in full force and effect with respect to the Unions; that while the Plan so continues in full force and effect with respect to the Unions, the Company will contribute to such Pension Fund but will not so contribute on and after its termination; that none of the funds contributed will revert to the Company but will, in the event of the Plan's termination, be allocated equitably with respect to active, retired and former Employees who are or were included in the bargaining unit or other active, retired or former Employees to which the coverage of the Plan extends, such allocation being set forth in Article X of the Plan.

In response to the enactment of ERISA, the plan was again amended in 1976, but in minor ways that did not impact upon the language regarding treatment of excess funds. Thus, the original plan language remained largely untouched between the plan's enactment in 1962 and AmShip's closing in 1983.

Plaintiffs filed their class action complaint in 1987 against AmShip; Huntington National Bank of Northeast Ohio, which served as the trustee of the fund; the pension committee; and its individual members. Later, the plaintiffs dismissed two of the three union-appointed employee representatives. Thus, the current defendants include AmShip, Huntington National Bank, the pension committee, and four of its members.

The case was referred to a magistrate for pretrial supervision, and both parties filed motions for summary judgment. Plaintiffs argued that both the original plan and the original plan summary unambiguously prohibited the reversion of any residual assets to AmShip, and distribution of plan assets to AmShip violated ERISA. Defendants countered that the plan was overfunded due to actuarial error, and the original plan allowed the return of such funds to AmShip. The magistrate recommended the denial of plaintiffs' motion for summary judgment and the granting of defendants' motion, because he found that the reversion of funds was permissible under the terms of the original plan. After a hearing before the district judge, the district court in a written opinion adopted the magistrate's report in its entirety and granted defendants' motion for summary judgment.

## II.

This case turns on a proper construction of AmShip's pension plan. Both plaintiffs and defendants maintain that the plan is wholly unambiguous, with the plain language of the document clearly supporting

each side's position. Alternatively, plaintiffs contend that the plan's language *is* ambiguous, thereby requiring either a trial or the granting of plaintiffs' summary judgment motion, because the admission of extrinsic evidence would establish the parties intended to forbid the reversion of any AmShip contributions back to the company.

■ We review a district court's grant of summary judgment under a *de novo* standard of review. *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). We examine the grant of summary judgment to determine whether the evidence presents a sufficient disagreement to require submission to a jury or "whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir.1989) (citation omitted). Although we must draw all justifiable inferences in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), there must exist some disagreement regarding an item of material fact. *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986).

■ The question of whether the language of a written agreement is ambiguous is one of law; therefore, "it may be resolved summarily." *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1360 (11th Cir.1988), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989). However, the interpretation of such language, once held to be ambiguous, is a factual issue turning on the intent of the parties. *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1128 (6th Cir.1981), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). Summary judgment is then proper only when the documents in question are undisputed and reveal that no question exists as to intent. *Manley v. Plasti–Line, Inc.*, 808 F.2d 468, 471 (6th Cir.1987).

■ Although arguably this is a simple dispute regarding contract interpretation, provisions of ERISA complicate its resolution. ERISA establishes a general requirement that plan assets be held in trust, and

it further requires that plan assets inure to the exclusive benefit of employees. 29 U.S.C. § 1103(c)(1). Section 1344(d)(1) provides the conditions that must be met for an employer to overcome the requirement against any reversion:

**(d) Distribution of residual assets; restrictions on reversions pursuant to recently amended plans; assets attributable to employee contributions; calculation of remaining assets**

(1) Subject to paragraph (3), any residual assets of a single-employer plan may be distributed to the employer if—

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

Thus, as we have stated previously, ERISA precludes "reversion of surplus assets to an employer unless there is specific and affirmative compliance with the conditions of § 1344(d)(1)(C)." *Rinard v. Eastern Co.*, 978 F.2d 265, 268 (6th Cir.1992), *petition for cert. filed*, 61 U.S.L.W. 3511 (U.S. Jan. 7, 1993) (No. 92–1169).

Defendants contend that they meet the requirements of § 1344(d), because section 10.3 of the plan clearly contemplates the reversion of residual assets to AmShip. Any other reading of the plan, according to defendants, would render that section nugatory, thereby violating the fundamental principle of contract construction that each contractual provision must be read so as to give each some effect. *See Chapman v. Orange Rice Milling Co.*, 747 F.2d 981, 983 (5th Cir.1984). The district court was in agreement with defendants on that point, and it read section 8.4 as setting forth a general prohibition against reversion of funds to the company which had to be read against section 10.3's specific and limited exception to the anti-reversion rule.

In response, plaintiffs maintain that section 8.4's language unambiguously requires that under no circumstances can funds revert back to the company. According to

plaintiffs, section 10.3 is "boilerplate" language inserted into all pension plans in response to the Internal Revenue Service's mandate that such language be included in return for tax exempt status for the pension fund. Thus, they argue, the non-traditional language found in section 8.4 must control. Plaintiffs also point to the plan summary and other extrinsic evidence which they allege bolsters their contention that AmShip cannot recoup the fund's residual assets.

Both parties refer to two relatively recent lines of Sixth Circuit case law which have discussed the ability of employers to recapture excess assets due to actuarial error. *Compare Bryant v. International Fruit Prods. Co.*, 793 F.2d 118, 122–23 (6th Cir.), *cert. denied*, 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986) *with International Union, United Auto Workers v. Dyneer Corp.*, 747 F.2d 335 (6th Cir.1984). However, despite the parties' best efforts to pigeonhole our case into either the *Bryant* or *Dyneer* line of reasoning, neither of our earlier cases is dispositive in this matter.

In *Bryant*, the defendant-employer created a benefit plan in 1959 which contained an absolute prohibition that no contributions, assets, or income from the plan could ever revert to the employer and no amendment could be enacted to cause such a reversion. *Bryant*, 793 F.2d at 120. To conform with the requirements of ERISA, the employer amended and restated the plan in 1976, and the anti-reversion sections of the 1959 plan were omitted. Finally, in 1982, concurrent with a resolution which terminated the pension plan, the company's board of directors amended the plan again to allow any funds accumulated due to actuarial error to return to the employer. We held that the 1959 plan precluded an amendment that would allow money once contributed to be reclaimed, because "[a]n agreement that provides that an act can occur in no event and under no circumstances cannot be converted into one that permits the act by a series of amendments

that first deletes the reference to the prohibition and then adds a provision permitting the forbidden act." *Id.* at 123; *see also Rosenbaum v. Davis Iron Works, Inc.*, 669 F.Supp. 813, 819 (E.D.Mich.1987) (where pension plan states that no funds contributed to trust nor assets of trust shall ever revert to or be made available to the employer, that language is absolute and it precludes post-ERISA amendment to the trust providing for reversion of assets to company), *aff'd in part and rev'd in part*, 871 F.2d 1088 (6th Cir.), *cert. denied*, 493 U.S. 890, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989). Accordingly, we voided the 1982 reversion amendment and ordered the funds to be distributed on an equitable basis to the plaintiffs.

Conversely, in *Dyneer*, we allowed funds to revert back to the employer when the pension plan included a provision allowing for such a transfer of funds. In that case, the pension plan had a provision allowing reversion of funds to the company if due to actuarial error. Another provision stated that not "all of any part of the Trust Fund [should] be used for or diverted to purposes other than for the exclusive benefit of Employees or their beneficiaries...." *Dyneer*, 747 F.2d at 337. This standard "exclusive benefit" language is required of all tax-qualified pension plans; indeed, very similar language appears in section 10.3 of the AmShip pension plan. *See* 29 U.S.C. § 1103(c)(1) (ERISA's exclusive benefit rule); 26 C.F.R. § 1.401–2(a)(1); (2). Thus, we focused in *Dyneer* on whether the reversion was due to "actuarial error,"[1] because we found no conflict between the provisions in the pension plan.

The plan at issue here differs somewhat from the plans in both *Bryant* and *Dyneer*. Unlike the plan in *Bryant*, which had no procedure for reversion of funds until an eleventh hour amendment to the plan allowed for excess funds to revert back to the company, the AmShip plan permitted reversion of excess funds from its

---

1. Neither party in this case disputes that the excess funds arose from "actuarial error." Thus, the only question for us is whether the plan allows for reversion of those funds to the company.

inception. In addition, the plan at issue here contained none of the ironclad anti-amendatory language found to be so important in *Bryant*. The AmShip plan also differs from the plan in *Dyneer*, which simply contains provisions parroting the language of the ERISA exclusive benefit rule. *See Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1117 (3d Cir.1989) (plan containing language identical to ERISA's exclusive benefit rule not enough to prohibit reversion of surplus assets to an employer where the plan contemplates such action); *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.*, 624 F.2d 513 (4th Cir. 1980) (same). Thus, neither *Bryant* nor *Dyneer* controls. Instead, we must examine the plan itself. Doing so confirms to us that the district court properly allowed the reversion of excess funds to the employer, for any other resolution of this matter would render section 10.3 nugatory.

Plaintiffs' arguments are unavailing, in large part because their reading of the original plan fails to provide an adequate interpretation of section 10.3. On the other hand, defendants' interpretation harmonizes all of the sections of the plan. Thus, we affirm the district court's conclusion that section 8.4 of the plan acted as only a general prohibition against reversion of funds that must be read in conjunction with the specific exception found in section 10.3.

In addition, amendments to the plan support defendants' view that the company could recapture excess funds resulting from actuarial error. Neither the trial court nor the magistrate, in particular, elected to examine anything other than the original plan document, in part because both believed the original plan controlled over any subsequent amendments. Such a conclusion rested on an erroneous reading of our precedents, for we have never held that courts may only examine the original written agreement when interpreting pension disputes. *See Dyneer*, 747 F.2d at 337 (specifically adopting the reasoning of other case law permitting corporate sponsors to recapture excess assets through amendments to pension plans); *see also Wright v. Nimmons*, 641 F.Supp. 1391, 1405–06 (S.D.Tex.1986) (corporations may amend employee pension plans if the plans can be amended consistently with the requirements imposed by ERISA). Rather, we have merely stated that in some instances language in an original pension plan which prohibits any amendment that provides for the use of trust funds for any purpose other than for the participants will preclude later amendments permitting recapture. *See Bryant*, 793 F.2d at 122–23 (the unequivocal prohibition against future amendments which would allow recapture of any contributions "sets this case apart"); *see also Rosenbaum*, 669 F.Supp. at 819–20.

Unlike the plans at issue in *Bryant* and *Rosenbaum*, the original 1962 pension plan in this case did not contain a provision limiting the ability of the parties to amend the plan. Section 9.3 simply forbade any amendment authorizing use of pension funds prior to the satisfaction of all liabilities to plan participants. Thus, analysis of amendments to the 1962 plan and its summary is altogether proper. That analysis confirms the defendants' view that excess funds due to actuarial error would revert back to AmShip.

Amendments to both the plan itself and the plan summary indicate that the parties contemplated reversion of excess funds to AmShip. Plaintiffs make much of the 1968 plan summary, which stated that under no circumstances could any trust funds revert back to the company, but the summary was amended two years later to indicate that reversion of funds to the company would be proper after all benefits were paid to employees. Section 8.4 of the plan was also amended in 1970 to state that article X of the plan established the process by which benefits were allocated. Article X, of course, contains the language allowing AmShip to recoup funds remaining after the payment of benefits due to actuarial error. Therefore, the amendments strengthen defendants' position that the parties intended that excess funds would revert to AmShip.

**AFFIRMED.**