GENCORP, INC., Plaintiff–Appellant,

v.

AMERICAN INTERNATIONAL UNDER-WRITERS, also known as A.I.U. Insurance Company; Riunione Adriatica Di Sicurta, also known as Adriatic Insurance Company; Allianz Versicherungs–A.G., also known as Allianz Insurance Company; American Insurance Company, also known as American Auto Insurance; American Home Assurance Company; American Re–Insurance Company; Associated International Insurance Company; Cigna Specialty Insurance Company; Central National Insurance Company of Omaha; Continental Casualty Company; Dairyland Insurance Company; Employers' Insurance of Wausau; Employers Reinsurance Corporation; Federal Insurance Company; Fidelity and Casualty Company of New York; Fireman's Fund Insurance Company; First State Insurance Company; Granite State Insurance Company; Insurance Company of North America; International Insurance Company; International Surplus Lines Insurance Company; Lexington Insurance Company; Liberty Mutual Insurance Company; Certain Underwriters at Lloyd's London; National Casualty Company; National Union Fire Insurance Co. of Pittsburgh, PA; Everset Reinsurance Company, formerly known as Everest Reinsurance Company; Republic Insurance Company; St. Paul Fire and Marine Insurance Company; Twin City Fire Insurance Company; United Insurance Company; Gibraltar Casualty Company; United National Insurance Company; Lumbermens Mutual Casualty Company; Cer-tain London Market Insurance Companies; Bellefonte Insurance Company, Ltd.; CNA Reinsurance of London Limited; Lexington Insurance Company, Ltd.; North Atlantic Insurance Company, Ltd.; St. Katherine Insurance Company, Ltd.; Stronghold Insurance Company, Ltd.; Wintrethur Swiss Insurance Company, Ltd. Defendants–Appellees.

No. 97–3869.

United States Court of Appeals,
Sixth Circuit.

Argued July 30, 1998.

Decided Feb. 5, 1999.

Thomas W. Ladd (argued and briefed), McCarter & English, Newark, New Jersey, for Appellant.

Michael P. Comiskey (argued and briefed), Lord, Bissell & Brook, Chicago, Illinois, for Appellees.

Before: SUHRHEINRICH, DAUGHTREY, and GILMAN, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

This is a declaratory judgment action brought to determine whether certain excess insurance policies, which "sit above" and "follow form" to two underlying umbrella insurance policies, incorporate from the underlying umbrella policies an absolute pollution exclusion endorsement added after the policy period had ended and made retroactive to the inception date of the underlying umbrella policies.

## I. Background

### A. The Policies

Plaintiff GenCorp, Inc. ("GenCorp") seeks coverage for alleged environmental liabilities under various insurance policies, including certain excess insurance policies [1] (the "Excess Policies") issued by Defendants [2] (the

---

**1.** General Tire & Rubber Company, now known as GenCorp, Inc., contracted for certain insurance pursuant to the following policies at issue in this appeal: London Policy Nos. UJLO1O8 and UJLO1O9; Federal Policy 79220025; American Re Policy M1027784; International Policy Nos. XSI 5769, XSI 5932, XSI 7189, XSI 7190, XSI 7753, and XSI 7754; Riunione Policy Nos. EL–1773, EL–3120 and EL–4261; St. Paul Policy 534XA6052; Century Policy Nos. ZCX 00 38 70, ZCX 00 42 87, and ZCX 00 60 39; Central Policy Nos. CNZ 14–09–24, CNZ 14–18–57, CNZ 14–18–58, CNZ 14–18–80, CNZ 14–18–85, and CNZ 00–65–68; First State Policy Nos. 929205, 930719, 932297, 924099, and 927498; Everest Policy Nos. DXC DX 1282 and DXC DX 1283; Gibraltar Policy Nos. GMX 00332, GMX 00333, and GMX 01416; Lumbermens' Policy 3SX 004 720; Associated Policy Nos. XS 100597 and AEL 00285C (two policies); Fireman's Policy Nos. XLX–120 28 35, XLX–126 71 67, XLX –36 92 99, XLX–137 05 96, XLX–143 72 21, and XLX–148 48 25; AIU Policy Nos. 75–100792, 75–101747, 75–102470 and 75–102565; Lexington Policy No. GC 550 4678; Granite Policy No. SCLD 80–94059; and Allianz Policy Nos. H 0 001 459 (three policies) and C 73 00 024.

**2.** Defendants–Appellees (hereinafter collectively the "Excess Insurers") include Certain Underwriters at Lloyd's, London, and Certain London Market Insurers (hereinafter "London"); American International Underwriters ("AIU"); Granite State Insurance Company ("Granite"); Lexington Insurance Company ("Lexington"); Riunione Adriatica Di Sicurta ("Riunione"); Allianz Versicherungs AG ("Allianz"); American Re–Insurance Company ("American Re"); Associated International Insurance Company ("Associated"); Central National Insurance Company of Omaha ("Central"); Century Indemnity Company ("Century"), as successor to CIGNA Specialty Insurance Company, f/k/a California Union Insurance Company; St. Paul Fire and Marine Insurance Company ("St.Paul"); Federal Insurance Company ("Federal"); Fireman's Fund Insurance Company ("Fireman's"); First State Insurance Co. ("First State"); Gibraltar Casualty Company ("Gibraltar"); Everest Reinsurance Company ("Everest"); International Insurance Company ("International"), as successor in interest to International Surplus Lines Insurance Company; and Lumbermens Mutual Casualty Company ("Lumbermens").

"Excess Insurers"). The Excess Policies generally required GenCorp to maintain underlying insurance coverage. Each Excess Policy also allegedly follows form to, and incorporates the terms, conditions, and exclusions contained in the applicable underlying umbrella policies.[3]

During the relevant period, GenCorp's underlying umbrella coverage insurer was Genco Insurance Limited ("Genco"). Genco is a captive insurance company that is wholly-owned by GenCorp. GenCorp purchased the following two insurance policies from Genco: (1) Policy No. 47002, covering January 1, 1975 through January 1, 1978; and (2) Policy No. 47005, covering January 1, 1979 through December 1, 1982 (collectively "Genco Policies"). These policies are umbrella excess third-party liability policies, providing first-level excess coverage to GenCorp. All of the Excess Policies at issue were in effect during all or part of the coverage periods of the Genco Policies.

### B. The Endorsements

In 1989, GenCorp filed a prior insurance coverage action in Ohio state court against various insurance carriers, including Genco, and many of the Excess Insurers, for pollution claims relating to different sites not at issue in this case ("State Action").[4] On April 7, 1994, GenCorp and Genco executed a settlement agreement ("Settlement Agreement") relating to the State Action. Pursuant to the Settlement Agreement, Genco agreed to pay GenCorp approximately $20 million in exchange for dismissal of the State Action as it related to Genco for a full and unconditional release from "all Environmental Claims that [GenCorp and related entities] or any of them have or may have against Genco."

The Settlement Agreement further provides:

3.6 *Policy Endorsement Amendment.* Subject only to Genco's payment and GenCorp's receipt of the Settlement Amount pursuant to Section 3.2, GenCorp agrees that Policy Numbers 47002 and 47005 each shall thereupon be amended, by separate endorsement retroactive in fact and effect to the date each of said policies were issued, each said separate endorsement *retroactive in fact and effect to the date each of said policies were issued,* and each said separate endorsement to read:

*THIS POLICY SHALL NOT APPLY:*

to any liability whatsoever for:

(1) bodily injury, personal injury or property damage arising out of the seepage, discharge, dispersal, release or escape or transmission of any solid, liquid, or resulting from: gaseous, thermal, audio or electromagnetic irritant, including, but not limited to, smoke, vapors, soot, waves, fumes, acid, alkalies, fibers, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into, or upon, land, the environment or any watercourse or body of water; or

(2) any liability loss, cost or expense of the insured arising out of any direction or request by any governmental authority, that pollutants be tested for [sic]

---

**3.** Excess Insurance has been described as follows:

> There are two principle kinds of excess coverage: "umbrella" excess coverage and "follow form" excess coverage. Both products are designed to add "height" to an insured's liability program by extending coverage above the limits provided in the underlying primary coverages. The underwriting involved in these products is distinct, since the primary coverages will usually be sufficient to handle claims against the insured. Consequently, excess policies are often purchased from a separate insurer that is competing aggressively in the excess market.
>
> The umbrella policy serves two purposes: to extend coverage above the limits of insurance provided in the underlying primary policies, and to offer coverage not available in the underlying policies....
>
> "Follow Form" Excess Liability Policies generally provide coverage under the same terms as the primary policy for liability in excess of those policy limits.

Francis J. Mootz III, *Insurance Coverage of Employment Discrimination Claims,* 52 U. Miami L.Rev. 1, 15–16 (1997). For a history of follow form excess policies, *see* Mitchell F. Dolin, *Excess Defense Coverage and Long–Tail Liabilities,* 32 Tort & Ins. L.J. 875 (1997).

**4.** This prior action was captioned *GenCorp, Inc. v. The Aetna Cas. & Sur. Co., et al,* No. CV 89 04 1208 (Summit County, Common Pleas).

monitored, cleaned up, removed, contained, treated, detoxified or neutralized; or

(3) any payment for the investigation or defense of any loss, injury or damage, or any cost, fine or penalty, or for any expense or claim or suit related to any of the above.

Notwithstanding the generality of this exclusion, it shall not exclude coverage for claims by any person alleging personal injury, bodily injury or property damage caused by a product when such damage occurs or is alleged to have occurred after the product has been sold and before the product has become a waste product or part of a waste product.

(hereinafter the "Endorsements").

The parties executed the Endorsements on January 18, 1995. Each Endorsement states that it is "effective from inception" of the policy. *See* Endorsement Eleven to Genco Policy 47002; Endorsement Nineteen to Genco Policy 47005.

The Settlement Agreement also called for Genco's reinsurers to pay $11 million of the $19,910,000 settlement amount. The Excess Insurers did not participate in the settlement.

## C. The Present Action

In the underlying action, GenCorp has been sued for polluting six locations in Ohio, Michigan, New Hampshire, and Connecticut.[5] In November 1995, GenCorp filed this suit against numerous insurance companies, including Defendants–Appellees, seeking defense costs and/or indemnification for losses incurred as a result of those actions. Although GenCorp did not name Genco as a party—presumably because of the Endorsements—one of the Excess Insurers added Genco as a third-party defendant. In re-

sponse, Genco defended by claiming that the Endorsements precluded it from any liability.

So did the Excess Insurers. They moved for summary judgment, claiming that their policies followed form to the Genco Policies and therefore contained the absolute pollution exclusion contained in the Endorsements.[6]

On May 20, 1997, the district court granted summary judgment to the Excess Insurers, holding that the Excess Insurers had no duty under the Excess Policies to defend or indemnify GenCorp for pollution claims. The district court found that, as a matter of contract law, the Excess Insurers were entitled to take advantage of the absolute pollution exclusion. *See GenCorp, Inc. v. AIU Ins. Co.*, 970 F.Supp. 1253, 1260 (N.D.Ohio 1997). On June 6, 1997, the district court executed a judgment granting partial or total summary judgment to various Excess Insurers, and certified the entry of final judgment under Rule 54(b).[7]

Also on June 6, 1997, GenCorp moved the district court to stay entry of final judgment and reconsider its ruling because GenCorp and Genco had entered into negotiations aimed at removing the policy Endorsements created by the 1994 Settlement Agreement. On June 17, 1997, GenCorp and Genco amended the Settlement Agreement, retroactively voiding the Policy Endorsements. On June 19, 1997, GenCorp moved to vacate the judgment under Fed.R.Civ.P. 59(e) based on the June 17 amendment to the Settlement Agreement. On June 20, 1997, the court denied GenCorp's June 6 motion for reconsideration and its June 19 motion to vacate.

On July 19, 1997, GenCorp filed its notice of appeal, appealing in whole or in part the Judgment Entry of June of 6, 1997, the Memorandum Opinion of May 20, 1997, the Memorandum Opinion and Order of June 6, 1997, the Memorandum Opinion and Order of June 20, 1997.

---

5. None of the sites at issue in the State Action is at issue here.

6. The parties do not dispute that the Genco Policies bar GenCorp's pollution-based claims.

7. This ruling did not resolve all the litigation below, which also involves claims against policies with effective dates outside the Genco Policy periods. Furthermore, the district court's ruling does not have any impact on any non-pollution claims GenCorp might raise under the Excess Policies.

## II. Grant of Summary Judgment[8]

GenCorp argues that the district court erred in granting summary judgment to the Excess Insurers based on the GenCorp/Genco Settlement Agreement because: (1) the Excess Insurers did not provide any consideration for, and GenCorp did not consent to, the incorporation of the absolute pollution exclusion into the Excess Policies; (2) the alleged change in coverage took place after Defendants' policies had expired and after GenCorp had begun to incur covered losses; (3) Defendants' policies are ambiguous and must be construed in favor of coverage; and (4) equity and public policy preclude such a result. In the alternative, GenCorp claims that the district court erred in denying its motion to vacate summary judgment because the factual basis for summary judgment no longer exists.

We review a district court's grant of summary judgment de novo. *See Tiemeyer v. Community Mut. Ins. Co.*, 8 F.3d 1094, 1097–98 (6th Cir.1993). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 603 (6th Cir.1988). The party moving for summary judgment bears the initial responsibility of informing the court that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. *See id.* at 324, 106 S.Ct. 2548. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, we must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996) (internal quotations omitted). *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir.1989).

■ The parties agree that Ohio substantive law applies.[9] Under Ohio law, insurance contracts are construed under the general law of contracts. *See Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir.1994); *Park–Ohio Indus., Inc. v. Home Indem. Co.*, 975 F.2d 1215, 1218 (6th Cir.1992).

### A. Lack of Consent and Consideration

■ GenCorp claims that the district court erred in allowing the Excess Insurers to appropriate the benefit of changes to the terms and conditions of the Genco Policies—effectively $438 million in potential insurance coverage—without obtaining GenCorp's consent and without providing GenCorp with any consideration. GenCorp disagrees with the district court's finding that GenCorp received "significant consideration" in exchange for the loss of coverage under its Excess Policies. The lower court held:

> GenCorp clearly received significant consideration—in the form of nearly $20 million—in exchange for adding the endorsement to policies 47002 and 47005. And it is hornbook law that "if the consideration given is sufficient to support a contract that it does not matter from or to whom it moves." *Coldwell Banker Residential Real Estate Services Inc. v. Bishop*, 26 Ohio App.3d 149, 151, 498 N.E.2d 1382

---

8. As the district court properly certified this matter under Fed.R.Civ.P. 54(b), our jurisdiction is proper. *See Knafel v. Pepsi Cola Bottlers of Akron, Inc.*, 850 F.2d 1155, 1159–60 (6th Cir.1988) (noting that unless district court properly exercises its discretion under Rule 54(b), order is not final and appellate court lacks jurisdiction).

9. Jurisdiction is based on diversity. *See* 28 U.S.C. § 1332 (1994).

(Hamilton Co.1985) (citing Restatement of Contracts 2d, section 71(4) (1981)).

*GenCorp, Inc. v. AIU Ins. Co.,* 970 F.Supp. 1253, 1260–61 (N.D.Ohio 1997).

GenCorp maintains that this analysis is flawed because "it fails to distinguish between two distinct [sets of] contracts: (1) the contract between GenCorp and Genco and (2) the contracts between GenCorp and its Excess Insurers—each of which requires independent consideration to support a change in its terms." Therefore, according to GenCorp, "while GenCorp clearly received consideration from Genco in exchange for reducing its coverage under the Genco Policies, GenCorp did not receive any consideration from the Excess Insurers in exchange for a corresponding reduction in coverage under the Excess Policies."

GenCorp further claims that the district court erred by crediting the Excess Insurers with some or all of the consideration provided to GenCorp by Genco because the money paid by Genco was not "bargained for" consideration as between GenCorp and the Excess Insurers. GenCorp points out that the Settlement Agreement itself states that "[n]either GenCorp nor Genco intend to confer to any other person any right or benefit under this Agreement." (Settlement Agreement, ¶ 3.12)). GenCorp notes that, although consideration may flow to or from parties other than the promisor and promisee, the consideration cannot be separated from intent, as the consideration and the promise must "bear a reciprocal relation of motive or inducement." (Appellant's Br. at 11 (quoting Restatement (Second) of Contracts § 71 cmt. b)).

GenCorp's arguments have merit only if we accept its premise that the incorporation of the absolute pollution exclusions into the Excess Policies constitutes a modification of each Excess Policy requiring new and separate consideration. We do not accept that premise. When GenCorp entered into the contracts with each Excess Insurer in the 1970s, it agreed that the Excess Policies would incorporate the terms of the underlying Genco Policies and that any of those policies could—at least under appropriate circumstances—be modified by endorsement.

In exchange for its consent to the terms of each Excess Policy, GenCorp received consideration in the form of insurance coverage.

Thus, when GenCorp agreed to add a retroactive pollution exclusion to the Genco Policies, GenCorp *had already* consented to incorporate that exclusion into the following form Excess Policies and *had already* received consideration for its inclusion. As the district court found:

> [M]any of the defendants apparently anticipated that the underlying contract might be amended and included provisions in their own contracts with GenCorp stating that coverage would be subject to the underlying policy's terms and conditions, *including changes by endorsement.* There is clearly no need for those defendants, who bargained to be bound by future changes, to provide new consideration to take advantage of endorsements favorable to them.

*GenCorp,* 970 F.Supp. at 1261 (footnotes omitted) (emphasis added).

Thus, contrary to GenCorp's assertions, the district court did not confuse the two contracts; it focused properly on the Excess Policies between GenCorp and the Excess Insurers.

For this reason it is immaterial that the Excess Insurers did not participate in the $20 million settlement of the State Action and that the parties to the Settlement Agreement did not intend to confer any benefit on any third parties because the Excess Insurers and GenCorp *did intend* for the Excess Policies to follow the form of the underlying Genco policies, including future changes. In other words, "[b]ecause [the Excess Insurers] bargained to accept the same terms as Genco received, as a matter of contract law they are entitled to take advantage of the absolute pollution exclusion." *Id.* at 1260. There is no dispute that GenCorp consented to, and received adequate consideration for, the placement of the Endorsements in the Genco Policies. Thus, for purposes of our analysis, they are a valid part of the Excess Policies.

GenCorp's reliance on *Rothell v. Continental Cas. Co.,* 198 Ga.App. 545, 402 S.E.2d 283

(1991), is unfounded. In *Rothell*, the policy at issue tracked the language of an existing statute. After the policy was issued, the statute was amended. The insurer argued that the change in the statute excluded coverage under the policy. The trial court granted summary judgment to the insurer, finding that the amended statutory provision had been incorporated into the policy and excluded coverage.

The court of appeals reversed, stating that "[c]onsideration is necessary for the valid modification of the coverage provisions of an insurance policy when such modification substantially alters coverage." *Id.* at 284. The court further reasoned:

> The parties entered into a contract which included express terms of coverage and noncoverage. The contract could not be unilaterally altered to the detriment of the insured by depriving the insured of coverage previously had and paid for, without some corresponding benefit. There was no evidence that the insured received any premium reduction or any consideration for a broadening of the exclusion and lessening of coverage.

*Id.*

GenCorp claims that, like *Rothell*, the Excess Insurers provided no consideration in exchange for a policy modification that eliminates GenCorp's coverage. *Rothell* is not analogous. Although the policy in *Rothell* tracked the language of the statute, it did not state that it was intended to track the statute or that it would follow any amendments to the statute. Thus, by the plain language of

the contract, any change to the statute did not automatically become an endorsement to the policy. By contrast, here, GenCorp expressly agreed that the Excess Policies would follow form to any changes in the underlying umbrella insurance policies. Consequently, the express terms of coverage in the Excess Policies require the endorsements to be read into the Excess Policies.

It is axiomatic that any modification of a contract must be supported by both mutual consent, *see Hanly v. Riverside Methodist Hosp.*, 78 Ohio App.3d 73, 603 N.E.2d 1126, 1130 (1991); *McDermott v. Continental Ins. Co.*, 69 Ohio App.3d 489, 591 N.E.2d 251, 254 (1990), and consideration. *See Richland Builders, Inc. v. Thorne*, 88 Ohio App. 520, 100 N.E.2d 433, 437 (1950) (per curiam). These principles do not come into play, however, because the relevant contracts—the individual contracts between each Excess Insurer and GenCorp—were not modified.

## B. Post–Loss and Post–Period Modifications

■ Next, GenCorp argues that insurance policies cannot be modified by endorsement subsequent to a loss. Given our conclusion that the incorporation of the absolute pollution exclusion provision into the Excess Policies was not a "modification" of the contracts between GenCorp and the Excess Insurers, this argument necessarily fails.[10] In any event, the cases cited by the parties are largely distinguishable because they do not deal with multi-layer policies. Rather, they address the effect of post-loss[11] and post-

10. Notably, GenCorp does not argue that the Endorsements were not enforceable as post-loss and post-period modifications of its underlying agreement with Genco.

11. In *Christian v. Metropolitan Life Ins. Co.*, 566 P.2d 445, 449 (Okla.1977), the plaintiff's employer and group long-term disability insurer changed the master group policy retroactive to a date before the plaintiff's injury to reduce the benefits payable. The court ruled in favor of the plaintiff, on the grounds that an employer has no right to modify a group insurance policy without consent of the covered employee if the employee has contributed a portion of the premium and is therefore a party to the contract. *Id.* at 448–49. Here, the contracting parties—GenCorp and each individual Excess Insurer—agreed to the

"follow form" provisions and therefore to the Endorsements.

In *Howell v. Blue Cross*, 563 So.2d 1289, 1292 (La.Ct.App.1990), the court rejected Blue Cross's unilateral attempt to add a rider excluding coverage for respiratory diseases after the plaintiff's loss when Blue Cross's own agent was responsible for inaccurate information on the insurance application. In the instant case, GenCorp and each individual Excess Insurer agreed at the time of contracting to be bound by potential changes in the underlying policies, including reductions.

In *Parris & Son, Inc. v. Campbell*, 128 Ga.App. 165, 196 S.E.2d 334, 339–40 (Ga.Ct.App.1973), the policyholder failed to read a renewal policy that provided less coverage than his previous policy. After a burglary loss occurred, the insur-

period [12] modifications or reformations [13] on parties to a single bilateral contract and, are therefore, analogous to the relationship between GenCorp and Genco, not the relationship between GenCorp and the Excess Insurers. Furthermore, there is no per se rule against post-loss modifications.[14] *Compare* Lee R. Russ & Thomas F. Segalla, 2 *Couch on Insurance* § 25:8 (3d ed.1997) (stating that "[t]he acceptance of an alteration or modification of the original contract, to be effective, must precede loss"); *with* Lee R. Russ & Thomas F. Segalla, 7 *Couch on Insurance* § 102:7 (3d ed.1997) (noting that "[w]hile the rule that loss must occur during the policy period for the insured to recover obviously excludes losses that occur before the policy is issued, the result is different when the parties validly agree to antedate the coverage and neither is aware that a loss has occurred between the date to which the policy is backdated and the date that the insurance was actually obtained"); Sara L. Johnson, et al., 43 AmJur.2d Ins. § 231 (1982 & Supp.1997) (remarking that "[i]t is generally held that where at the time of an application for insurance there has been a loss but neither the applicant nor the insurer knew of this fact, a recovery may be had on a policy subsequently issued which was antedated so as to include the time at which the loss occurred"); *United States v. Patryas*, 303 U.S. 341, 345, 58 S.Ct. 551, 82 L.Ed. 883 (1938) (stating that "[n]o legal obstacle prevents parties, if they so desire, from entering into contracts of insurance to protect against loss that may possibly have already occurred"); *Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co.*, 997 F.2d 172, 176 (6th Cir.1993) (discussing precedent for proposition that "even losses that

---

ance agent assured him that he was "fully covered." The court held that the policyholder could not rely on the agent's statements as a way of unilaterally expanding coverage when the policyholder ignored his duty to read the policy himself. By contrast, GenCorp knew what its original coverage was, bilaterally agreed to reduce that coverage, and presumably knew that the Excess Policies would be affected.

**12.** GenCorp also argues that courts have refused to interpret contracts to change the scope of coverage after the policy period. GenCorp notes that courts have explicitly rejected such a construction in cases involving the insured's post-policy acquisition of additional companies, despite broad policy language purporting to provide coverage for any company subsequently acquired by the insured. *See Textron, Inc. v. Aetna Cas. & Sur. Co.*, 638 A.2d 537 (R.I.1994); *Total Waste Mgmt. Corp. v. Commercial Union Ins. Co.*, 857 F.Supp. 140 (D.N.H.1994).

These cases are distinguishable. Both cases evaluated whether the term "insured" included a subsidiary acquired after the policy expiration date, and not the effect of a post-loss or post-policy endorsement that purported to reduce or enlarge the coverage. *See Textron*, 638 A.2d at 539–41; *Total Waste*, 857 F.Supp. at 146.

**13.** The Excess Insurers cite several cases dealing with reformation. *See Broadhead v. Hartford Cas. Ins. Co.*, 773 F.Supp. 882, 911–15 (S.D.Miss. 1991), *aff'd*, 979 F.2d 209 (5th Cir.1992); *R.W. Beck & Assoc. v. City & Borough of Sitka*, 27 F.3d 1475, 1480–83 (9th Cir.1994); *Truck Ins. Exch. v. Wilshire Ins. Co.*, 8 Cal.App.3d 553, 87 Cal.Rptr. 604, 607–08 (Cal.Ct.App.1970). Under Ohio law, "[r]eformation of an instrument is an equitable remedy whereby a court modifies the instrument, which, due to mutual mistake on the part of the

original parties to the instrument, does not evince the actual intention of those parties." *Mason v. Swartz*, 76 Ohio App.3d 43, 600 N.E.2d 1121, 1125 (1991) (per curiam) (citation omitted). This is not a reformation case, and neither side makes such a claim.

**14.** In *Ruston Drilling Co. v. U.S. Fidelity & Guaranty Co.*, 81 F.2d 943 (8th Cir.1936), for example, the policy holder agreed, by endorsement dated October 3, 1932, to reduce the limits of its liability insurance policy, retroactive to September 1, in exchange for a reduction in premium. *See id.* at 943–44. On September 21, one of the policyholder's employees was injured on the job. *See id.* The employee later brought suit against the policyholder and ultimately settled for an amount in excess of the amended policy limits. *See id.* at 945. When the policyholder sought to recover indemnity from its insurer, the court held that the policyholder was bound to the lower limits, even though the loss preceded the date of the retroactive endorsement. *See id.* at 945–47. In so holding, the court gave effect to the "plain and unambiguous" language of the endorsements, reflecting the mutual intent of the parties. *See id.*

Like the policyholder in *Ruston*, GenCorp agreed with Genco to a retroactive reduction in coverage at a time when there were no *known* losses. Moreover, GenCorp received consideration for the change, and likewise agreed with the Excess Insurers to the follow form provisions. Most importantly, GenCorp presumably paid premiums based on the Excess Insurers' assessment of the risk entailed by such a provision. Thus, like the policyholder in *Ruston*, GenCorp is bound by its agreements to the reduced coverage.

have already occurred may be insured against, provided their occurrence is unknown to the parties at the time of insurance"); *Canadian Indem. Co. v. Tacke*, 257 F.2d 342, 344 (9th Cir.1958) (observing that "a predated agreement creates a liability for an injury existing at the time it is entered into is a matter of settled insurance law"); *Aetna Cas. & Sur. Co. v. Condict*, 417 F.Supp. 63, 71–72 (S.D.Miss.1976) (same); *State Mut. Life Assurance Co. v. Heine*, 49 F.Supp. 786, 788 (W.D.Ky.1943); *Affiliated FM Ins. Co. v. Kushner Cos.*, 265 N.J.Super. 454, 627 A.2d 710, 716 (1993); *Burch v. Commonwealth County Mut. Ins. Co.*, 450 S.W.2d 838, 841 (Tex.1970); *Western Fire Ins. Co. v. Moss*, 11 Ill.App.3d 802, 298 N.E.2d 304, 311–12 (1973); *Hunt v. Aetna Cas. & Sur. Co.*, 153 Colo. 584, 387 P.2d 405, 406 (1963) (en banc).

One case cited by GenCorp dealing with the effect on an excess carrier of a post-loss modification to an underlying policy is somewhat analogous to this case. In *Crown Ctr. Redev. Corp. v. Occidental Fire & Cas. Co.*, 716 S.W.2d 348 (Mo.Ct.App.1986), Crown Center Redevelopment Corporation, Hallmark Cards, and the Hyatt Corporation filed a declaratory judgment action against their insurance carriers seeking coverage for losses arising out of the collapse of two skywalks at a Hyatt Regency Hotel. *See id.* at 350–52. Hyatt had purchased a comprehensive general liability policy from Occidental. *See id.* at 351. Columbia Casualty Company, a third-level excess carrier, followed form to the terms and conditions of the Occidental policy. *See id.* at 359. At issue was whether Crown Center and Hallmark had been added as additional insureds under the Occidental policy prior to the loss occurrence—the skywalk collapse on July 17, 1981. *See id.* Crown Center and Hallmark had been added as named insureds pursuant to a policy endorsement issued after the collapse, but made effective retroactive to the policy's inception, which predated the collapse. *See id.* Columbia argued that if the endorsement were upheld it would create "an unlimited right in a primary carrier to add any entity as an insured after a loss occurred and in that manner bind the excess carrier"—the same argument GenCorp makes here. *See id.*

The trial court granted summary judgment for Crown Center. Columbia appealed. The court of appeals held that Columbia was, in fact, bound by the modification of the underlying policy "because all of the evidence demonstrates that Hallmark and Crown Center were actually accepted by Occidental as additional insureds prior to the loss." *Id.*

GenCorp claims that, by basing its holding solely on the fact that the modification of the underlying policy occurred prior to the insured's loss, the *Crown Center* court accepted Columbia's argument that an excess carrier cannot be bound by the post-loss modification of an underlying policy. GenCorp adds that, in this case, it is undisputed that GenCorp's losses, in fact, preceded the modification of the underlying Genco policies. That is, GenCorp's losses commenced no later than December, 1982, while the Genco Endorsements were not executed until March 1, 1995—more than 12 years later.

We do not read *Crown Center* so broadly. By expressly basing its holding on the fact that the undisputed evidence demonstrated that Hallmark and Crown Center were actually covered by the underlying policy prior to the loss, the *Crown Center* court avoided the legal question posed. *See id.* at 360.

GenCorp also argues that a ruling in the Excess Insurers' favor is shortsighted because it allows policyholders and their underlying carriers to substantially modify an insured's excess coverage years after those underlying policies expire, without the knowledge or consent of the excess carrier. More fundamentally, GenCorp claims that it undermines the very nature of insurance, which is to protect against risks, not to compensate for known losses.

Ironically, GenCorp engaged in the same legal conduct it now challenges on appeal when it agreed in 1994 to include retroactive endorsements to the 1975–1978 and 1979–1982 Genco Policies as part of the State Action Settlement Agreement. Yet GenCorp does not argue that the Settlement Agreement itself is invalid. In any event, GenCorp's concerns are largely unfounded. Parties can protect themselves from unwanted modifications—through contract. Notice and

right to cancel provisions, as well as provisions preventing post-loss endorsements, for example, can protect excess insurers from assuming unwanted risks arising from endorsements. In fact, many of the policies at issue contain such provisions.

As for undermining "the very nature of insurance," it bears repeating that the relevant risk here is the risk the Excess Insurers and GenCorp agreed to when they consented to the "follow form" provisions.[15] It is not disputed that there were no known losses at that time.

Although, as noted, fortuitous loss is implicit in the concept of insurance, *see* Lee R. Russ, 7 *Couch on Insurance* § 102:7 (3d ed.1997); risk can exist with respect to past events, such that retroactive coverage, and noncoverage, is a permissible subject of an insurance contract.[16]

### C. Notice

GenCorp argues that several of the Excess Policies specifically require that the Excess Insurers receive notice of any modifications to the underlying Genco Policies.[17] GenCorp alleges that "[s]uch provisions can be reasonably construed to mean that these insurers do not follow form to changes for which they have not received notice," or at a minimum, create an ambiguity, since there is no evidence in the record indicating that GenCorp provided notice of the Endorsements to the Excess Insurers. GenCorp adds that the notice requirements illustrate the Excess Insurers' own belief that the scope of their coverage cannot be changed without their consent or the opportunity to adjust their premiums in consideration of such changes.

GenCorp failed to make this argument below, and it has forfeited it on appeal. *See Elkins v. Richardson–Merrell, Inc.,* 8

F.3d 1068, 1072 (6th Cir.1993) (holding that appellate court will not normally address issue raised for the first time on appeal). In any event, it is also axiomatic that a party cannot benefit from its own breach. *See, e.g., Market Street Assoc. Ltd. Partnership v. Frey,* 941 F.2d 588, 592 (7th Cir.1991) (holding that "a contracting party cannot be allowed to use his own breach to gain an advantage by impairing the rights that the contract confers on the other party") (applying Wisconsin law); *Morgan v. Crowley,* 91 Ga.App. 58, 85 S.E.2d 40, 49 (1954) ("A party cannot take advantage of his own default in the performance of a contract. The provision of the contract sought to be invoked by the defendant, insofar as it related to a breach by him, was for the benefit of the plaintiff, and he cannot be heard to plead his own breach as a defense...."); *Cussler v. Firemen's Ins. Co.,* 194 Minn. 325, 260 N.W. 353, 356 (1935) (holding that law will not permit insured to profit from his own breach of contract when insured disregarded his contractual obligation to cooperate with insurer). As the Excess Insurers point out, any notice provision obviously existed for the benefit of the insurer, and it would be up to GenCorp to notify the appropriate Excess Insurer that it had altered the underlying policy. GenCorp's failure to provide notice of the Endorsements cannot therefore be a basis for excluding them from the Excess Policies.

### D. Ambiguities

GenCorp argues that the district court erred in granting summary judgment because both the Genco Endorsements and the Excess Policies themselves contain ambiguities, the policies must be strictly construed against the insurer.

---

**15.** Presumably the amount of premium GenCorp paid correlated with the risk assumed by the Excess Insurers.

**16.** Although a potentially more difficult question arises if retroactive endorsements increase coverage, that issue is not before us.

**17.** Genco points to American Reinsurance Policy No. M1027784, which provides that:

the coverage provided by this Certificate shall follow the insuring agreements, conditions and exclusions of the underlying insurance (whether primary or excess) immediately preceding the layer of coverage provided by this Certificate, including any changes by endorsements. The Company shall be notified of any changes in coverage or premium in such underlying insurance and copies shall be furnished to the Company upon request.

The interpretation of an insurance contract is a legal question. *See Leber v. Smith,* 70 Ohio St.3d 548, 639 N.E.2d 1159, 1163 (1994). If the contract terms are clear and unambiguous, the court presumes that the parties' intent resides in the words of the agreement. *See Kelly v. Medical Life Ins. Co.,* 31 Ohio St.3d 130, 509 N.E.2d 411, 413 (Ohio 1987); *Park–Ohio Indus.,* 975 F.2d at 1218 (citations omitted). That is, if the meaning of the contract is apparent, the terms of the agreement are to be applied, not interpreted. *See Timber Ridge Inv., Ltd. v. Marcus,* 107 Ohio App.3d 174, 667 N.E.2d 1283, 1285 (1995). Extrinsic evidence is admissible, however, if the contract is unclear or ambiguous. *See Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (1996); *Shifrin v. Forest City Ent., Inc.,* 64 Ohio St.3d 635, 597 N.E.2d 499, 501 (Ohio 1992). "An ambiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *Affiliated FM,* 16 F.3d at 686 (internal quotation omitted). Ambiguities may be patent or latent. A latent ambiguity arises when language is clear on its face, but some intrinsic fact or extraneous evidence gives rise to two or more possible meanings. *See Conkle v. Conkle,* 31 Ohio App.2d 44, 285 N.E.2d 883, 887–88 (1972). Whether a contract is ambiguous is also a question for the court. *See Potti v. Duramed Pharmaceuticals, Inc.,* 938 F.2d 641, 647 (6th Cir.1991) (applying Ohio law). If the court determines that a contract term is ambiguous, a question of fact for the jury arises. *See id.*

In construing a contract, the court must give effect to every phrase or clause, taking into account the subject matter, nature and purpose of the agreement. *See Affiliated FM,* 16 F.3d at 686. Provisions are to be strictly construed against the insurer only when they are ambiguous. *See University of Cincinnati v. Arkwright Mut. Ins. Co.,* 51 F.3d 1277, 1280 (6th Cir.1995). Moreover, "[t]he fundamental goal in insurance policy interpretation is to ascertain the intent of the parties from a reading of the contract in its entirety, and to settle upon a reasonable interpretation of any disputed terms in a manner calculated to give the agreement its intended effect." *Burris v. Grange Mut. Cos.,* 46 Ohio St.3d 84, 545 N.E.2d 83, 89 (1989), *overruled on other grounds,* 67 Ohio St.3d 500, 620 N.E.2d 809 (1993); *see also Bivens Gardens Office Building, Inc. v. Barnett Banks,* 140 F.3d 898, 911 (11th Cir.1998) (noting that the foremost goal of contract construction is to give effect to the parties' intent, and that the rule of construction that ambiguities are to be construed against the drafter is "something of a fallback canon"). We review the district court's legal conclusions de novo. *See Potti,* 938 F.2d at 647.

Before turning to the individual policies, we need to address the resounding refrain of GenCorp's ambiguities arguments; namely, that the Excess Policies are ambiguous because there are missing terms, and that because ambiguities exist, summary judgment is ipso facto improper. This argument is flawed because it ignores the interface between substantive contract law principles and the procedural standards of Fed.R.Civ.P. 56. We find the following interpretative framework helpful:

> This disagreement is couched in terms that are reminiscent of a familiar set of legal rules—rules which provide, in general, that a contract can be interpreted by the court on summary judgment if (a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity.
>
> The initial step in this pavane—the question of whether a contract is ambiguous—presents a question of law for the judge. If the court finds no ambiguity, it should proceed to interpret the contact—and it may do so at the summary judgment stage. If, however, the court discerns an ambiguity, the next step—involving an examination of extrinsic evidence—becomes essential.
>
> The taking of this second step does not automatically preclude *brevis* disposition. Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court

supports only one of the conflicting interpretations. On the other hand, if the extrinsic evidence relevant to the interpretation of an ambiguous contractual provision is contested or contradictory, summary judgment will often be inappropriate.

*Torres Vargas v. Santiago Cummings,* 149 F.3d 29, 33 (1st Cir.1998) (internal citations and quotations omitted) (analyzing an ERISA contract); *see Boston Five Cents Savings Bank v. HUD,* 768 F.2d 5, 8 (1st Cir.1985) (observing that even if there is ambiguity in the language of a contract, the evidence presented about the parties' intent may be so one-sided that no reasonable person could decide the contrary) (citing 3 Corbin on Contracts § 554 (1960)); *see also Terry Barr Sales Agency, Inc. v. All Lock Co.,* 96 F.3d 174, 179 (6th Cir.1996) (observing that summary judgment is proper in contract actions when documents or evidence underlying the contract are undisputed and there is no question as to intent) (applying Michigan law); *Parrett v. American Ship Building Co.,* 990 F.2d 854, 858 (6th Cir.1993) (same)(ERISA action).

In other words, in the summary judgment context, the mere incantation of "ambiguity" by the nonmovant does not satisfy its burden under Rule 56. The nonmoving party must present evidence to support a reasonable interpretation that differs from the moving party. To be sure, this squares with the concept of legal ambiguity, which presupposes two or more reasonable interpretations. With these principles in mind, we turn to the specific arguments.

## 1. Endorsements

GenCorp claims that the Endorsements apply only to the Genco Policies because they expressly state that the post-loss policy modification applies to "this Policy." [18] Alternatively, GenCorp claims that "[e]ven if this language standing alone did not create an ambiguity as to whether the Endorsements were to be included as language to which the

Excess Insurers follow form, the circumstances of excess carriers attempting to follow a post-loss endorsement which specifies that it only modifies 'this Policy' creates a latent ambiguity."

■■■ GenCorp forgets that when it acquired the Excess Policies, it agreed that they would follow form to the Genco Policies. This means that, with certain exceptions, the provisions of the Genco Policies would be read into the Excess Policies. When GenCorp further agreed to include the absolute pollution exclusion in the Genco Policies, it necessarily agreed to include that exclusion in the Excess Policies. The "this Policy" language in the post-loss endorsement therefore creates no latent ambiguity.

The same reasoning applies to GenCorp's argument that a latent ambiguity exists because the Endorsements further specify that the coverage to be affected by the Endorsements is "umbrella excess third party liability" coverage, which means the Genco Policies. In sum, we find no ambiguity, latent or otherwise, in either instance.

Next, GenCorp argues that the district court implicitly acknowledged the ambiguities in the Endorsements by looking to the extrinsic Settlement Agreement and incorporating its "in fact and effect" language into the Endorsements by reference. Even if the lower court erred in examining the Settlement Agreement, the result does not change, because the Endorsements themselves state that the absolute pollution exclusions were "effective from inception, January 1st, 1975[9]." In any event, the district court specifically held that the absolute pollution exclusion, which by its own terms was "effective from inception," applies to the contractual relationships between GenCorp and the Excess Insurers. *See GenCorp,* 970 F.Supp. at 1263.

■■■ Similarly, GenCorp argues that extrinsic evidence supports its interpretation.

---

**18.** GenCorp relies on the following language:

INSURED: THE GENERAL TIRE AND RUBBER COMPANY COVERED: UMBRELLA EXCESS THIRD PARTY LIABILITY

It is hereby mutually understood and agreed that effective from inception, January 1st, 1975[9], *this Policy* shall not apply: to any liability whatsoever for: (1) bodily injury,.... (emphasis added.)

GenCorp points to ¶ 3.12 of the Settlement Agreement, which provides that neither party to that agreement "intend[ed] to confer to any other person any right or benefit under this Agreement," and the testimony of Gen-Corp's Director of Risk Management. However, because as a general proposition we find the incorporation of the Endorsements into the Excess Policies via the follow form provisions unambiguous, extrinsic evidence is inadmissible. Furthermore, the relevant intent for purposes of our analysis is the intent of the Excess Insurers and GenCorp at the time they entered into the Excess Policies, not the intent of GenCorp and Genco at the time of the Settlement Agreement.

### 2. Excess Policies

GenCorp challenges the district court's rulings regarding many of the Excess Policies. For clarity's sake, we examine each policy at issue on appeal in the same order as the district court.[19]

### a. London Policy Nos. UJL0108, UJL0109

Defendants Certain Underwriters at Lloyd's, London, and Certain London Market Insurers (the "London Market Defendants") moved for summary judgment on Policies UJL0108 and UJL0109. Both policies cover calendar year 1977. Policy UJL0108 is part of the first layer of policies in excess of Genco policy 47002. Policy UJL0109 is part of the next higher layer of policies. Both policies provide:

> This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the said Underlying Umbrella Policy/ies prior to the happening of an occurrence for which claim is made hereunder and should any alteration be made in the premium for the Underlying Umbrella Policy/ies then the premium hereon shall be adjusted accordingly.

Policy UJL0108 refers to the "Underlying Umbrella Policy/ies" as "GENCO INSURANCE LIMITED." Policy UJL0109 refers to the "Underlying Umbrella Policy/ies" as "GENCO INSURANCE LIMITED & Certain Underwriters at Lloyd's, London and various Insurance Companies."

The district court held that both policies referred to Genco as the underlying umbrella insurer and that the above language effectively incorporated the absolute pollution exclusion. On appeal, GenCorp complains that Policy UJL0109 is ambiguous because it points to more than one underlying policy, namely UJL0108 and the Genco Policy.

GenCorp's argument ignores the fact that London Policy UJL0109 is part of the coverage in the $30 million layer of insurance which sits in excess of the $15 million layer containing London Policy UJL0108, which in turn sits above the $5 million Genco umbrella layer. Thus, it is not ambiguous for London Policy UJL0109 to follow form to both London Policy UJL0108 and the applicable Genco policy.

█ GenCorp also argues that the London Market Policies do not incorporate the post-occurrence Endorsement. The policies state that they are subject to "the same ... exclusions ... as are contained in or as may be added to the said Underlying Umbrella Policy/ies *prior to the happening of an occurrence for which claim is made hereunder* ...." (emphasis added.)

We agree that the foregoing phrase unambiguously precludes post-loss Endorsements because they were, by definition, "added to" the policy after the happening of an occurrence. The Excess Insurer responds that because the exclusionary endorsements were made retroactive to inception, the exclusions were "contained in" the Genco Policies as of inception and are therefore not post-loss endorsements. True; but this does not negate the fact that the Endorsements were not actually "added to" the Genco Policies until after the occurrences for which a claim is

---

19. GenCorp's various arguments regarding the numerous policies are strewn throughout the text and footnotes. The Excess Insurers' response brief is similarly arranged. Untangling all the issues raised has been challenging. We reorganized the arguments, for the most part by policy, and presented each policy in the same order as the district court.

made. Thus, London's reading requires us to ignore the "added to" language of the phrase, and runs counter to the principle that courts must give effect to every clause in a contract. *See Prudential Ins. Co. v. Corporate Circle, Ltd.,* 103 Ohio App.3d 93, 658 N.E.2d 1066, 1069 (1995). The district court therefore erred in granting summary judgment to London on the foregoing policies as the "retroactive from inception" language created a latent ambiguity.

### b. Federal Insurance Company Policy No. 79220025

Federal Insurance Company ("Federal") moved for summary judgment on Policy No. 79220025, which covers January 1, 1975 to January 1, 1976. It states in relevant part:

In consideration of the payment of the required premium and subject to all the terms of this policy, the Company agrees to pay on behalf of the Insured **LOSS** resulting from any occurrence insured by the terms and provisions of the First **UNDERLYING INSURANCE** policy scheduled in Item 6 of the Declarations (except for the Limits of Liability and defense provisions, if any). The insurance afforded by this policy shall apply only in excess of and after all **UNDERLYING INSURANCE** (as scheduled in Item 6 of the Declarations) has been exhausted.

GenCorp argues that "Underlying Insurance" does not necessarily (or exclusively) refer to the Genco Policies, but could also refer to the primary insurance provided.

■ Policy No. 79220025 defines "Underlying Insurance" as "meaning all policies scheduled in Item 6 of the Declarations." Genco 47002 is listed as the "First Underlying Insurance policy" in Item 6. As the district court found, there is no ambiguity; both the insurer and policy number are clearly referenced. *See generally* Lee R. Russ & Thomas F. Segalla, 2 *Couch on Insurance* § 18:23, at 18–34, 18–35 (3d ed.1997) (observing that provisions of another policy may be incorporated by reference when the reference is clear).

■ GenCorp also argues that the Federal Policy is ambiguous as to which terms and conditions are followed, because the terms and conditions of the Genco Policies changed over time. GenCorp asserts that due to the changes in the underlying Genco Policies, it is unclear whether the Federal Policy is incorporating the "terms and provisions" as they existed: (1) at the inception of the Federal Policy; (2) on the date of loss; (3) on the date of notice; or (4) after 1995 when the Endorsements were added to the Genco Policies. GenCorp ignores the fact that it made the Endorsements "effective from inception." Thus, by virtue of this provision, the "terms and provisions" of the Genco Policies are the same at all four points in time. Like the district court, we find no ambiguity.

### c. American Re–Insurance Company Policy No. M1027784

The relevant language of Policy No. M1027784, which covers January 1, 1976 to January 1, 1977, states:

Except as may be inconsistent with this Certificate, the coverage provided by this Certificate shall follow the insuring agreements, conditions and exclusions of the underlying insurance (whether primary or excess) immediately preceding the layer of coverage provided by this Certificate, including any change by endorsements. The Company shall be notified of any change in coverage or premium in such underlying insurance and copies thereof shall be furnished to the Company upon request.

GenCorp argues that Policy No. M1027784, while it refers to the "immediately preceding layer of coverage," fails to identify Genco at all. This claim is completely without merit. Item 4 of the Declarations lists the "Underlying Insurance" as "$5,000,000 each occurrence and Annual Aggregrate where applicable, following terms and conditions of Genco Insurance Limited, Policy No. 47002, excess of primary." Further, the American Policy clearly indicates that it follows form to "any change by endorsements." The district court's grant of summary judgment to American Re–Insurance on Policy No. M1027784 was correct.

d. **International Insurance Company Policy Nos. XSI 5769, XSI 5932, XSI 7189, XSI 7190, XSI 7753, XSI 7754**

International Insurance Company, as successor in interest to International Surplus Lines Insurance Company, sought summary judgment on six policies: XSI 5769 and XSI 5932, both covering December 1, 1979 to December 1, 1980; XSI 7189 and XSI 7190, both covering December 1, 1980 to December 1, 1981; and XSI 7753 and XSI 7754, both covering December 1, 1981 to December 1, 1982. The pertinent language in each is as follows:

> To indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of the underlying insurance described in item 4 of the declarations: provided further that the limit of the company's liability under this policy shall not exceed the applicable amount described in item 5 of the declarations.

> The provisions of the immediate underlying policy are incorporated as a part of this policy except for any obligation to investigate and defend and pay for costs and expenses incident to the same, the amount of the limits of liability, any "other insurance" provision and any other provisions therein which are inconsistent with the provisions of this policy.

"Immediate Underlying Policy" is defined as "the policy of the underlying insurance which provides the layer of coverage, whether primary or excess, immediately preceding the layer of coverage provided by this policy." "Underlying Insurance" means "the insurance policies described in item 4 in the declarations and includes any renewals or replacements of such policies."

GenCorp claims that these policies are somehow ambiguous because they identify merely the "immediately preceding layer of coverage" instead of Genco by name. This argument must be rejected. As noted, the follow form language references item 4 of the declarations, and item 4 in each policy declares that underlying insurance is established "as per Policy Number 47005 ISSUED BY GENCO INSURANCE LIMITED." Thus, not only does each policy expressly reference Genco, it also supplies the policy number.

e. **Riunione Policy Nos. EL–1773, EL–3120, EL–4261**

GenCorp challenges the district court's grant of summary judgment on three Riunione policies: EL–1773, covering February 1, 1977 to January 1, 1978; EL–3120, covering January 1, 1979 to December 1, 1979; and EL–4261, covering December 1, 1979 to December 1, 1980.

Riunione Policies Nos. EL–1773 and EL–3120 contain the following language:

> It is agreed that this policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the Primary Insurance in all respects including changes by endorsement and the Insured shall furnish the Company with copies of such changes. It is further agreed should any alteration be made in the premium for the policy/ies of the Primary Insurers during the period of this Policy, then the premium hereon other then [sic] the Minimum Premium shall be adjusted accordingly.

"Primary insurance" is a defined term in Riunione Policy Nos. EL–3120 and EL–1773, meaning "the policy (policies) described in Item 3 [of the declarations]."

Policy No. EL–4261 provides in relevant part:

> This policy, except where provisions to the contrary appear herein, is subject to all of the conditions, agreements, exclusions and limitations of and shall follow the underlying policies in all respects, including changes by endorsement.

■ The district court granted summary judgment as to Policy Nos. EL–3120 and EL–4261 because both list the Primary Insurer in Item 3 as "Genco Ins. Ltd. 47002." After noting that Riunione Policy No. EL–1773 was "not a model of clarity" and did not "identify the primary insurer other than saying 'as on file,'" the district court nonetheless ruled in favor of the Excess Insurer because "it appear[ed] undisputed elsewhere in the voluminous record in this case that Genco 47002 was the primary insurer for the

time period covered by EL–1773." *GenCorp,* 970 F.Supp. at 1265. GenCorp claims this ruling is inaccurate because the "primary insurer" at that time was actually Liberty Mutual Insurance Company, and improper because it presumes facts in Riunione's favor.

We disagree. First, GenCorp has offered no *proof* that Liberty Mutual Insurance Company was the "primary insurer" as that term is defined in the policy. Furthermore, Riunione Policy No. EL–1773 specifically provides:

> This policy covers excess limits only as shown in Section I after and only after the limits, as shown in Section II, of another insurance company, referred to as the primary insurer, are fully used and exhausted.

Thus, the "primary insurer" listed in Item 3 of the declarations is synonymous with the insurer listed in Section II. Furthermore, it is undisputed that the limits of the "primary insurer" set forth in Section II are the same limits found in Genco Policy No. 47002.

Granted, Item 3 of Riunione Policy EL–1773 does not specify which exact policy it follows form to. Yet the Excess Insurer offered uncontradicted proof that the Riunione Policy issued to GenCorp for the following year, No. EL–2401, was more specific, listing "Genco Ins. Ltd. 4002" next to Item 3. GenCorp has offered no contradicting evidence to plausibly suggest that another carrier was the "primary insurer" here, and therefore failed in its duty as a nonmovant under Rule 56 to come forward with affirmative evidence that creates a triable issue of fact. Absent a true ambiguity, the grant of summary judgment as to No. EL–1773 was proper.

■ Next, GenCorp argues that the Riunione policies evince an intent not to be bound by post-policy changes to the underlying insurance by such limiting language as "during the period of Policy." This argument is without merit. Read in context, it is clear that the foregoing language refers ex-clusively to alterations in the premium during the policy period.

### f. St. Paul Fire & Marine Policy No. 534XA6052

Policy No. 534XA6052, which covers January 1, 1973 through January 1, 1976, states as a condition of coverage the following:

> It is agreed that this Policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the Primary Insurance in all respects, including changes by endorsement and the Insured shall furnish the Company with copies of such changes. It is further agreed should any alteration be made in the premium for the policy/ies of the Primary Insurers during the period of this Policy, then the premium hereon other than the Minimum Premium shall be adjusted accordingly.

The policy lists the "Primary Insurance" as "Chubb & Son, Inc.," Policy No. 79220007, "Including Renewals or Replacements," and describes it as "Excess Liability Policy."

The district court determined that the St. Paul contract followed the parameters of the Chubb policy. The Chubb policy, in turn, apparently was the same policy as Federal Insurance Company policy 79220025, which followed form to the "First Underlying Insurance" that is identified as 47002.[20]

GenCorp faults the district court for holding that the St. Paul policy followed form to one of the Genco Policies because Genco is not expressly identified in the St. Paul policy. Nonetheless, the record establishes that the St. Paul policy expressly references "Chubb & Son Inc." as the "Primary Insurance," and "Policy No's. (Including Renewals and Replacements)" as "79220007." Chubb Policy No. 79220007 lists the First Underlying Insurance Policy as "Continental Casualty Co." However, Policy No. 79220007 covers January 1, 1973 to January 1, 1974. Policy No. 79220007 was replaced by Chubb Policy No. 79220008, which covers the period from January 1, 1974 to January 1, 1975. Policy No. 79220008 likewise lists "Continental Casualty

---

**20.** The insurance policies list "Chubb & Son Inc." as "manager" and "Federal Insurance Company" on the face of the documents.

Co." as the First Underlying Insurance policy. However, Policy No. 7922008 was replaced by Policy No. 79220025, covering the period of January 1, 1975 to January 1, 1976. Policy No. 79220025 lists "Genco Insurance Limited Policy 47002" as the First Underlying Insurance Policy. In short, the 1975–76 St. Paul Policy effectively follows form to the applicable Genco policy. Further, GenCorp has offered absolutely no proof to the contrary.

Finally, GenCorp argues that the "during the period of the Policy" language means that St. Paul did not intend to be bound by post-loss modifications to the underlying policy. For the reasons stated regarding the Riunione policy, we reject this argument.

### g. Century Indemnity Policy Nos. ZCX 00 38 70, ZCX 00 42 87, and ZCX 00 60 39

The district court granted summary judgment to Century Indemnity Company on the basis of the following three policies: ZCX 00 38 70, covering December 1, 1979 to December 1, 1980; ZCX 00 42 87, covering December 1, 1980 to December 1, 1981; and ZCX 00 60 39 covering December 1, 1981 to December 1, 1982. The declarations page of all three policies describe the policy as providing "EXCESS UMBRELLA LIABILITY," and list the designated underlying primary carrier as "GENCO INSURANCE COMPANY" and "GENCO INSURANCE LIMITED." However, only ZCX 00 42 87 and ZCX 00 38 70 state: "NOW, this Certificate is to indemnify the Insured in accordance with the applicable insuring agreements, exclusions and conditions of the primary insurance for excess loss as specified in Item 3 (Description of Excess Insurance) of the declarations." The lower court found that "from the context of the portion of the policy that is submitted, it appears that the [ZCX 00 60 039] was intended to provide the same coverage as the first two [Century Indemnity] policies." *GenCorp*, 970 F.Supp. at 1266 n. 13. The district court further found that, although the policies failed to identify the Genco policy

47005 by number, it was clear from the time frame that Genco policy 47005 was in fact the underlying contract.

GenCorp claims that "these presumptions in favor of the movant constitute a clear violation of policy interpretation rules and summary judgment standards." GenCorp is wrong. The only failing here is GenCorp's inability to demonstrate an ambiguity through extrinsic evidence. Given the absence of such, summary judgment for Century Indemnity was proper.

### h. Central National Policy Nos. CNZ 14–09–24, CNZ 14–18–57, CNZ 14–18–58, CNZ 14–18–80, CNZ 14–18–85, CNZ 00–65–68

Central National Insurance Company of Omaha moved for summary judgment on the following six policies: CNZ 14–09–24, covering January 1, 1977 to January 1, 1978; CNZ 14–18–57 and 14–18–58, both covering January 1, 1979 to January 1, 1980; CNZ 14–18–80, covering December 1, 1979 to December 1, 1980; CNZ 14–18–85, covering December 1, 1980 to December 1, 1981, and CNZ 00–65–68, covering December 1, 1981 to December 1, 1982. Each policy contains the following language:

> This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amounts and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies stated in Item 2 of the Declarations prior to the happening of an occurrence for which claim is made hereunder.[21]

The district court held that the underlying umbrella policy during the time frame of the first policy was Genco policy 47002; and that for the remaining policies, the underlying umbrella policy was Genco policy 47005. The court granted summary judgment as to all six policies.

GenCorp reads the foregoing language as expressly refusing to follow endorsements

---

**21.** Policy CNZ 00 65 68 provides that the "Underlying Umbrella Policies" are "stated in Item 6

of the Declarations."

added to the underlying policy after an "occurrence" has taken place. So do we. For the same reasons we indicated with respect to the London Policies, summary judgment to Century Indemnity on these policies was improper. Given this outcome, we need not consider GenCorp's other argument that policy CNZ 14–18–80 is ambiguous because it fails to identify the Genco policy to which it follows form.

### i. First State Policies Nos. 929205, 930719, 932297, 924099 and 927498

Policy No. 930719, covering December 1, 1980 to December 1, 1981 and Policy No. 932297, covering December 1, 1981 to December 1, 1982, provide:

> This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies stated in Insuring Agreement 1 prior to the happening of an occurrence for which claim is made hereunder.

GenCorp claims that Policies 930719 and 932297 do not specifically identify Genco as the underlying carrier to which they follow form. To the contrary, the "Coverage" section in each of these policies plainly states:

### UNDERLYING UMBRELLA INSURERS AND POLICY NUMBER:

Genco Insurance Company

Policy Number—To Be Advised

GenCorp also faults the district court for "improperly presuming" that the specific Genco policy number "to be advised" was one of the Genco Policies containing the Endorsements. According to the lower court, these policy numbers were "apparent from the time frame." Once again, GenCorp has failed to present any evidence that any policy other than Genco Policy 47005 would be applicable. Moreover, the district court's holding is consistent with the fact that the First State policies required GenCorp to maintain

underlying insurance—to which it followed form—during the period of the First State policy. Thus, knowing Genco was the insurer, the only logical conclusion is that Genco Policy 47005, covering January 1, 1979 through December 1, 1982, was the applicable policy. Thus, the grant of summary judgment was proper.

GenCorp also claims that First State Policy No. 925932 indicates that it follows form to "United Insurance Company Policy No. 155024." However, First State did not move for summary judgment on Policy 925932, which was inadvertently attached to First State's original summary judgment in place of Policy 924099, on which First State did move for summary judgment. A motion to correct this error was filed and granted. Thus, we need not consider GenCorp's argument regarding this policy.

More substantially, GenCorp argues that all five policies refuse to follow endorsements "added to" the underlying policy after an occurrence has taken place. We agree, for reasons stated previously. Thus, the district court erred in granting summary judgment to First State as to these five policies.

### j. Everest Reinsurance Policy Nos. DXC DX 1282 and DXC DC 1283[22]

Policies Nos. DXC DX 1282 and 1283 both cover the time period of January 1, 1979 to December 1, 1979, and provide two different layers of insurance. Both contain the following language:

> The insurance afforded by this policy is subject to the same warranties, terms, conditions and exclusions as are contained in the Underlying Insurance on the effective date of this policy, except unless specifically provided in this policy, any such warranties, terms conditions or exclusions relating to premium, the obligation to investigate and defend, the amount and limits of liability, and any renewal agreement.

The "Underlying Insurance" in each policy is identified as Genco, with policy number "to be determined." The district court held that each policy fell within the time period cov-

---

**22.** Everest Reinsurance Company was formerly known as Prudential Reinsurance Company.

The policies themselves state that they are "Prudential Reinsurance Company" policies.

ered by Genco policy 47005 and granted summary judgment to the excess insurer. *See GenCorp*, 970 F.Supp. at 1267.

GenCorp complains of improper inference. Again, we hold that GenCorp has failed to present any evidence to create a genuine issue of fact that any policy other than Genco Policy 47005 policy applied. The district court did not err in granting summary judgment to Everest.

### k. Gibraltar Casualty Policy Nos. GMX 00332, GMX 00333 and GMX 01416

Policies Nos. GMX 00332 and 00333 both cover the time period December 1, 1979 to December 1, 1980. The policies provide different layers of insurance. Policy No. GMX 01416 covered the period from December 1, 1981 to December 1, 1982. The relevant language of each states:

> Except as may be otherwise provided by the terms and conditions of this policy, the insurance afforded by this policy shall follow the insuring agreements and is subject to the same warranties, terms, definitions, conditions, and exclusions, except as to any renewal agreement, as are contained in the Underlying Insurance identified in Item 5 of the Declarations on the effective date of this policy.

In all three, the "Underlying Insurance" is listed as "Genco Insurance Limited Umbrella Liability Policy No. (to be determined)." The district court held that because the polices were issued in the time period covered by Genco Policy 47005, the absolute pollution exclusion was incorporated into the policies, and Gibraltar was entitled to summary judgment.

Again, GenCorp argues that the district improperly "filled the gap." Again, we note that GenCorp has supplied us with no proof that the gap could have been filled by any other policy. The grant of summary judgment was proper.

### l. Lumbermens Mutual Policy No. 3SX 004 720

Lumbermens Policy No. 3SX 004 720, provided coverage from January 1, 1973 to January 1, 1976. Lumbermens Mutual Policy No. 3SX 004 720 provides in relevant part:

> 2. **Maintenance of Underlying Insurance.** The insured shall maintain the underlying insurance in full force and effect during the entire period of this policy . . .
>
> . . . .
>
> ■ 5. **Application of Underlying Insurance.** Except as otherwise stated herein and except with respect to (1) any obligation to investigate or defend any claim or suit, or (2) any obligation to renew, the insurance afforded by this policy shall conform to the underlying insurance. . . .

The policy names "Continental Casualty Company" ("Continental") as the underlying insurer. The district court held that because the contract required GenCorp to maintain underlying insurance, and because its contract "conformed to the underlying insurance," the contract necessarily followed form to Genco Policy 47002, which replaced Continental beginning January 1, 1975.

GenCorp criticizes the court's ruling because Lumbermens' express language does not provide for such an automatic conversion. This argument misses the boat. The Lumbermens contract expressly required GenCorp to maintain underlying insurance. Thus, when the Continental policy terminated, GenCorp was required to seek new coverage for the remainder of the Lumbermens policy period. Also pursuant to the express language of the contract, the Lumbermens policy follows form to the underlying insurance policy, which became Genco Policy 47002 on January 1, 1975. Furthermore, GenCorp offers no proof that Genco was not the underlying insurer from January 1, 1975 to January 1, 1976. Thus, the following form language in the Lumbermens Policy clearly incorporates the terms, conditions, definitions and exclusions of Genco Policy 47002, which was the underlying insurer during the relevant time period at issue.

### m. Associated International Insurance Company Policy Nos. XS 100597, AEL 00285C

Defendant Associated International Insurance Company ("Associated") sought sum-

mary judgment on Policy Number XS 100597, covering December 1, 1981 to December 1, 1982, and two policies both numbered AEL 00285C, covering December 1, 1979 to December 1, 1980, and December 1, 1980 to December 1, 1981. Policy No. XS 100597 provides:

> Except as may be inconsistent with this Policy, the coverage provided by this Policy shall follow the insuring agreements, conditions and exclusions of the underlying insurance (whether primary or excess) immediately preceding the layer of coverage provided by this Policy, including any change by endorsements. The Company shall be notified of any change in coverage or premium in such underlying insurance and copies thereof shall be furnished to the Company upon request.

"Underlying Insurance" is identified as "Genco and Certain Insurance Companies." Similarly, the policies numbered AEL 00285 C state that coverage is provided for harm "arising out of the hazards covered by and as defined in the Underlying Umbrella Policies stated in Item 2 of the Declarations and issued by GENCO and certain Insurance Companies."

As to policy number XS 100597, the district court determined that the time period of the policy was the period during which the underlying umbrella contract was Genco Policy 47005, making the retroactive absolute pollution exclusion applicable to this policy. *See GenCorp*, 970 F.Supp. at 1268. The district court likewise found that policy numbers XS 100285C, referenced Genco Policy 47005 and therefore the retroactive pollution exclusion provision. *Id.*

On appeal GenCorp argues that AEL 00285C and XS 100285C ambiguously refer to more than one policy. GenCorp adds that "certain" or "various" other insurers could include the primary carrier, Liberty Mutual, or the other excess carriers, which cannot be determined from the language of the policy.

It simply does not matter if the Associated policies follow form to other policies, because the relevant language is phrased in the con-junctive. That is, the Associated policies also follow form to Genco Policy 47005, and therefore obtain the benefit of the absolute pollution exclusion. Thus, as the district court held, these policies incorporate the retroactive absolute pollution exclusion provided by Genco Policy 47005.

**n. Fireman's Fund Policy Nos. XLX 120 28 35, XLX 126 71 67, XLX 136 92 99, XLX 137 05 96, XLX 143 72 21, XLX 148 48 25[23]**

GenCorp challenges the district court's grant of summary judgment on the following six Fireman's policies: XLX 120 28 35, covering January 1, 1976 to January 1, 1977; XLX 126 71 67, covering January 1, 1977 to January 1, 1978; XLX 136 92 99, covering January 1, 1979 to December 1, 1979; XLX 137 05 96, covering December 1, 1979 to December 1, 1980; XLX 143 72 21, covering December 1, 1980 to December 1, 1981; and XLX 148 48 25, covering December 1, 1981 to December 1, 1982.

Each of these policies contains the following statement:

> The insurance afforded by this policy is subject to the same warranties, terms (including the terms used to describe the application of the limits of liability), conditions and exclusions as are contained in the underlying insurance on the effective date of this policy, except, unless otherwise specifically provided in this policy, any such warranties, terms, conditions or exclusions relating to premium, the obligation to investigate and defend, the amount and limits of liability, and any renewal agreement.

The district court determined that "[t]he underlying insurance on the effective dates of the six remaining policies was Genco Policy 47002 (for XLX 120 28 35 and XLX 126 71 67) or Genco Policy 47005 (XLX 136 92 99, XLX 137 05 96, XLX 143 72 21 and XLX 148 48 25)". 

GenCorp claims that the foregoing policies are ambiguous because their follow form

---

**23.** The Excess Insurers refer to Policy No. "XLX 143 72 38" as one of the policies covering the years 1980–82. That does not appear to be the case. Notwithstanding, their appellate brief indicates that "XLX 148 48 25" is at issue on appeal, which coincides with the above time frame.

clauses do not refer expressly to the Genco Policies as the underlying insurance. Moreover, GenCorp argues that the policies do not necessarily or exclusively refer to the umbrella excess Genco Policies, but could refer to the underlying primary insurance provided by Liberty Mutual.

■ Policies XLX 120 28 35 and XLX 126 71 67, which cover the 1976–78 period, refer to the "Schedule of Underlying Insurance" with the phrase "as on file with the Company." We agree with the Excess Insurers that such a designation clearly refers to all underlying policies, and therefore necessarily includes Genco. GenCorp does not dispute that Genco Policy 47002 was the underlying umbrella insurer during that time. Furthermore, the Excess Insurer presented the affidavit of Sheldon B. Cypin, a Senior Litigation Analyst at Fireman's, who attested that Genco Policy 47002 was the first layer umbrella policy from January 1, 1975 to January 1, 1978.

Policy No. XLX 136 92 99 (covering January 1, 1979 to January 1, 1980) simply shows "T/B/I" for "to be inserted." GenCorp submitted nothing to suggest that Fireman's Fund agreed to anything other than the underlying insurers' group for that year, i.e., with Genco as the umbrella insurer. However, it is undisputed that Policy No. XLX 136 92 99 required GenCorp to maintain underlying insurance during the policy period and that Genco Policy 47005 was in effect at that time. Thus, the grant of summary judgment on this policy was proper.

Policies Nos. XLX 137 05 96, XLX 143 72 21 and XLX 148 48 25 specifically list Genco as the underlying umbrella insurer and various other companies as intervening insurers. Again, GenCorp has not presented any evidence to suggest that Genco was not the issuer of the umbrella policies underlying each Fireman's policy. The district court's ruling was not in error.

### o. AIU Policy Nos. 75–100792, 75–101747, 75–102470, 75–102565

Defendant AIU moved for summary judgment on the following five policies: No. 75–100033, covering January 1, 1978 to January 1, 1979; No. 75–100792, covering January 1, 1979 to January 1, 1980; No. 75–101247, covering December 1, 1979 to December 1, 1980; No. 75–102470, covering December 1, 1980 to December 1, 1981; and No. 75–102565, covering December 1, 1981 to December 1, 1982. The district court found that the first policy was outside the time period of coverage of either Genco 47002 or 47005, and denied summary judgment as to that policy.

The remaining policies included the following follow form language:

The Company agrees with the Insured named below, in consideration of the premium paid and subject to all the terms and conditions set forth below that the insurance afforded by this policy shall follow all the terms and conditions of Policy No. _____ issued by _____ including all renewals and rewrites thereof.

As the district court noted, only policy No. 75–102565 lists both Genco and the correct policy number, i.e., 47005. The remaining policies have the phrase "T/B/A" in the blank accompanying the policy numbers, and each policy except 75–102470 lists Genco in the second blank. The district court held that "[t]he rather shoddy completion of the above form language" was not "fatal" to AIU because it was clear that the last four policies fell within the period during which Genco Policy 47005 provided the underlying umbrella insurance. The court therefore granted summary judgment as to all four policies. *See GenCorp,* 970 F.Supp. at 1269.

Policies 75–100792 and 75–101747 contain express terms that Genco is the underlying carrier. Therefore, we agree with the district court that as to these two policies it is evident that they follow form to Genco Policy 47005, which provided the underlying umbrella insurance during the relevant time frame. GenCorp has offered no evidence to support any other conclusion.

Policy No. 75–102470 is a different story. The Excess Insurers acknowledge that No. 75–102470 is deficient, but claim that "the record confirms that Genco Policy 47005 was in fact the underlying insurance policy during the period from 12/1/80 to 12/1/81 to which the AIU policy follows form." It is undisput-

ed that Genco Policy 47005 covered the period between December 1, 1980 to December 1, 1981. GenCorp has not offered any evidence that Policy No. 75–102470 followed form to any underlying insurer other than Genco. We therefore affirm the district court's grant of summary judgment as to these AIU Policies.

### p. Lexington Insurance Company Policy No. GC 5504678

Lexington moved for summary judgment on Policy No. GC 5504678, covering January 1, 1976 to January 1, 1977. The policy provides in pertinent part:

> This policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies as stated in Item 2 of the Declarations prior to the happening of an occurrence for which claim is made hereunder.

Item 2 of the Declarations lists Genco Policy 47002 as the underlying umbrella policy. The district court therefore held that Lexington was entitled to take advantage of the absolute pollution exclusion.

Notwithstanding, as with the London, Central National, and First State Policies, the grant of summary judgment was inappropriate because the policy language expressly excludes post-loss endorsements.

### q. Granite Policy SCLD 8094059

Granite Policy No. SCLD 8094059 contains the following relevant language:

> The Company agrees with the Insured named below, in consideration of the premium paid and subject to all the terms and conditions set forth below that the insurance afforded by this policy shall follow all the terms and conditions of Policy No. *TO BE ADV.* issued by GENCO INSURANCE COMPANY including all renewals and rewrites thereof.

The district court held that although it failed to provide the policy number, SCLD 8094059 referred to Genco as the underlying insurer. Because it was undisputed that Genco Policy 47002 was in effect during the time period covered by Granite's policy, the court granted summary judgment to Granite.

GenCorp faults this ruling, claiming the district court improperly presumed the specific Genco policy number in the Excess Insurer's favor. Once again, GenCorp fails to present any evidence to establish ambiguity. Thus, contrary to its assertion, the district court did not misunderstand summary judgment standards. Rather, GenCorp failed to satisfy them.

### r. Allianz Versicherungs AG Policy Nos. H 0 001 459 (three policies) and C 73 00 24

Defendant Allianz Versicherungs AG sought summary judgment regarding the following four policies: three numbered H 0 001 459 that covered the periods of January 1, 1979 to January 1, 1980; December 1, 1979 to December 1, 1980; and December 1, 1980 to December 1, 1981; and one numbered C 73 00 024 that covered the period of December 1, 1981 to December 1, 1982. As the district court noted, "none of the [Allianz] policies makes specific mention of the scope of the coverage or whether the policies were to 'follow form' to the underlying policy." *See GenCorp,* 970 F.Supp. at 1271. Further, in the "Coverage" section the policies either stated, "per form and endorsements attached/submitted", or "per information submitted." The policies do not refer to Genco by name.

In holding that Allianz was entitled to summary judgment, the district court relied on correspondence between the company and GenCorp indicating that the underlying Genco umbrella policy for the time period was "the lead wording" or "the lead word applying to this program." Although the lower court felt that "Allianz' evidence is rather scanty on its link to the underlying Genco policy," it nonetheless held that Allianz "had submitted evidence sufficient to indicate its policies followed form to Genco 47005." *GenCorp,* 970 F.Supp. at 1271.

GenCorp contends that the district court erred in interpreting this ambiguous lan-

guage to follow form to the Genco Policies and the Endorsements thereto. GenCorp further argues that even if this ambiguous language could be interpreted as pointing to the underlying Genco Policies the past-tense employed implies that the version of the Genco Policies to be followed is that which could have been "attached" or "submitted" when the Allianz policy was first issued, that is, the version without the 1995 Endorsement.

Again, we note that GenCorp made the Endorsements retroactive "to inception." As to the quantum of proof, we note that GenCorp, who had the burden of demonstrating a genuine disagreement, failed to provide any evidence of such. For this reason, we hold that the Endorsements are part of the Allianz policies and that the grant of summary judgment was proper.

### 3. Effective Date

GenCorp argues that those Excess Policies which purport to follow one of the Genco Policies as it existed on its "effective date" contain latent ambiguities because of the unique circumstances of this case.[24] GenCorp claims that, because the Endorsements are retroactive, there are two possible interpretations of whether the Genco Policies contained the 1995 absolute pollution exclusion on their respective "effective dates" of January 1, 1975 and January 1, 1979. GenCorp maintains that the most reasonable interpretation of this phrase is that, because the Endorsements were not added until March 1, 1995, they were not contained in the Genco Policies on their respective dates and thus are not a part of the policies to which these excess carriers follow form.

■ However, as we have said before, GenCorp agreed that the Endorsements would be "effective from inception." Thus, from the Excess Insurers' standpoint, the Endorsements were in place on the effective dates of the Genco Policies, and were therefore properly incorporated into the applicable policies.

### E. Public Policy Arguments

GenCorp also claims that the district court's decision violates fundamental principles of equity, public policy, and common sense because the Excess Insurers are receiving a multi-million dollar "windfall" from a settlement agreement in which they did not participate. This argument is basically a rehash of its contract-based arguments. As we have discussed, there is nothing illegal about giving full force and effect to the unambiguous written terms of the Excess Policies which follow form to the absolute pollution exclusion contained in the Genco Policies. *See generally Dorsey v. Contemporary Obstetrics & Gynecology, Inc.*, 113 Ohio App.3d 75, 680 N.E.2d 240, 243 (1996) (observing that "Ohio courts have held the concept of 'freedom of contract' to be fundamental to our society," absent unconscionability). As the district court observed, the Excess Insurers are benefitting from a fortuitous change in the underlying contracts, but that fortuity was created by GenCorp.

■ GenCorp also claims, for the first time on appeal, that the Endorsements are void because the State of Ohio did not approve of the use of the absolute pollution exclusion until January 1985. This court has rejected the same argument in reference to the predecessor of Ohio Rev.Code § 3937.03. *See McCullough Transfer Co. v. Virginia Surety Co.*, 213 F.2d 440, 442–43 (6th Cir. 1954) (concluding that Ohio Legislature intended merely to fine insurers for failing to file a policy endorsement; noting that had Legislature intended to void such contracts it could have easily said so in express words). Ironically, GenCorp itself incorporated the absolute pollution exclusion into the pre–1985 insurance coverage through the retroactive Endorsements. In any event, GenCorp forfeited the argument.

### III. Denial of the Motion to Alter or Amend

GenCorp contends that the district court abused its discretion by failing to grant Gen-

---

**24.** The following Excess Policies each contains this "effective date" language:

Everest Reinsurance Policy Nos. DXCDX 1282 and DXCDX 1283; Fireman's Fund Policy

Nos. XLX 120 28 35, XLX 126 71 67, XLX 136, 28, 03, XLX 136 92 99, XLX 137 05 96, XLX 143 72 21, XLX 148 48 25; Gibraltar Policy Nos. GMX 00332 and GMX 00333.

Corp's Rule 59(e) motion in light of the Second Amendment to Settlement Agreement. That Amended Settlement Agreement, executed on June 17, 1997, eleven days after the court entered judgment, retroactively voided the Endorsements which formed the basis of the court's judgment. The district court ruled that it would "not revisit this issue after entering judgment and certifying this case for appeal ... on the basis of a new legal strategy by the plaintiff."

GenCorp maintains that its Rule 59(e) motion is based solely on the district court's failure to account for events occurring after its entry of summary judgment, and that the denial of the Rule 59(e) motion may be appealed and considered separately from GenCorp's appeal of the judgment itself. The Excess Insurers respond that we lack jurisdiction over the district court's order, and that GenCorp's argument also fails on the merits.

 We review the district court's denial of the Rule 59(e) motion for abuse of discretion. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.1998); *Davis v. Jellico Community Hosp. Inc.*, 912 F.2d 129, 133 (6th Cir.1990).

### A. Jurisdiction

The Excess Insurers take issue with our jurisdiction. They contend that we lack jurisdiction over the district court's order because the lower court failed to include an express finding under Rule 54(b) in the order denying GenCorp's motion to alter or amend.[25] The Excess Insurers continue that the denial could not properly have been certified for appeal by the district court, because the motion to vacate was based entirely on a new matter not even pleaded in this action.

 The Excess Insurers' first argument is spurious. The underlying judgment has been properly certified under Rule 54(b), and is therefore a "final" judgment for appeal

purposes. *See Zapata Gulf Marine Corp. v. P.R. Maritime Shipping Auth.*, 925 F.2d 812, 814–15 (5th Cir.1991) (per curiam) (noting that in a Rule 54(b) motion "the requirement of an express determination of no just reason for delay is an unequivocal notice by the district court that that document constitutes a final appealable judgment"); 10 James W. Moore, *et al.*, 10 *Moore's Federal Practice*, ¶ 54.22[1] (3d ed.1997) (noting that "[b]ecause Rule 54(b) does not relax the requirement of finality of judgment, any order that finally disposes of the single claim in such an action is appealable as a final judgment under 28 U.S.C. § 1291 in any event") (footnote omitted); *see generally General Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1026–27 (6th Cir.1994) (noting that, for Rule 54(b) certification, the appealed ruling must be a "judgment" upon a cognizable claim for relief and must be "final" in the sense that it is an ultimate disposition of an individual claim entered in the course of an action involving multiple claims or parties). A Rule 59(e) motion relates to the underlying final judgment, *see Abbs v. Sullivan*, 963 F.2d 918, 925 (7th Cir.1992) (observing that "[t]he premise of such a motion is that the judgment was wrong in some respect. This makes a challenge to the denial of the motion a challenge to the judgment itself."); and, as a general matter, the appeal from the denial of a Rule 59(e) motion is treated as an appeal from the underlying judgment itself. *See Foman v. Davis*, 371 U.S. 178, 181–82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Boburka v. Adcock*, 979 F.2d 424, 426 (6th Cir.1992); *Peabody Coal Co. v. Local Union Nos. 1734, 1508 and 1548*, 484 F.2d 78, 81–82 (6th Cir.1973); *Mazzola v. Secretary of Health & Human Servs.*, 795 F.2d 222, 224 n. 1 (1st Cir.1986) (per curiam). There is simply no reason, or authority, to require separate certification for a Rule 59(e) ruling which relates to, and indeed exists because of, a judgment made "final" by certification under Rule 54(b).[26]

---

**25.** The Excess Insurers stress that the Rule 59(e) motion was filed thirteen days after the district court entered judgment. Rule 59(e) motions must be filed within ten days after entry of judgment. Fed.R.Civ.P. 59(e). However, Fed. R.Civ.P. 6(a) states that when the period of time is less than 11 days, weekends are excluded.

Here, June 6, 1997 was on a Friday. Therefore, GenCorp had until June 20, 1997 to file it motion. Thus, to the extent that the Excess Insurers are making a veiled argument that the motion was untimely, they are incorrect.

**26.** Not surprisingly, the Excess Insurers fail to cite any cases to support this assertion. The

■ The Excess Insurers also suggest that the district court's denial of GenCorp's motion to vacate could not properly have been certified for appeal by the district court because the motion to vacate was based entirely on a new matter not pleaded in this action. There is authority to the contrary, however. In *Peterman v. Indian Motorcycle Co.*, 216 F.2d 289 (1st Cir.1954), the First Circuit stated:

> In so far as [a Rule 59(e) motion] ... presents some new matter which was not before the court at the time it entered the judgment—for instance, if the motion is based upon newly discovered evidence, ...—then if the aggrieved party wishes to present to the appellate court the contention that the trial court erred as a matter of law in denying the [Rule 59(e) motion], he cannot do so by appealing from the final judgment alone; he must file a notice of appeal from the subsequent order denying the motion. This he may do, for such order of denial, after entry of judgment, amounts to a decision to let the judgment stand ... and since nothing further remains to be determined in the cause, the order of denial is a "final decision...."

*Id.* at 291; James Wm. Moore, *et al.*, *Moore's Federal Practice*, ¶ 59.62[2](3d ed.1997) (same; citing *Peterman*). Similarly, in *Abbs,* Judge Posner observed:

> If the judgment was correct when rendered but afterward something happens that requires that the judgment be changed, the denial of a Rule 59(e) motion would be separately appealable from the judgment—the appellant's only quarrel with the district court being over its failure to take account of the post-judgment event.

963 F.2d at 925 (dictum). *See also Mazzola,* 795 F.2d at 223–24 (holding that appellate court had jurisdiction over claimant's appeal from the denial of his motion for reconsideration separable from underlying judgment despite claimant's failure to appeal from the underlying judgment because the reconsider-

ation motion raised changes in the relevant medical criteria).

Here, GenCorp filed a notice of appeal from both the underlying judgment and the order denying GenCorp's motion to alter or amend. In short, GenCorp covered all of its jurisdictional bases; and the Excess Insurers' arguments to the contrary are completely without merit.

## B. Merits

GenCorp contends that the Amendment to the Settlement Agreement, also made retroactive in fact and effect, rescinds Section 3.6 of the Settlement Agreement, deletes the Endorsements, and thus negates the very premise that formed the basis of the lower court's judgment. GenCorp argues that Rule 59(e) is available to allow a party to present newly discovered evidence and to prevent manifest injustice.

■ Motions to alter or amend judgment may be granted if there is a clear error of law, *see Sault Ste. Marie Tribe*, 146 F.3d at 374, newly discovered evidence, *see id.*, an intervening change in controlling law, *Collison v. International Chem. Workers Union, Local 217*, 34 F.3d 233, 236 (4th Cir.1994); *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 90–91 n. 3 (1st Cir.1993); *School District No. 1J v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993), or to prevent manifest injustice. *Davis*, 912 F.2d at 133; *Collison*, 34 F.3d at 236; *Hayes*, 8 F.3d at 90–91 n. 3. *See also North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995).

■ To constitute "newly discovered evidence," the evidence must have been previously unavailable. *See ACandS,* 5 F.3d at 1263; *Javetz v. Board of Control, Grand Valley State Univ.* 903 F.Supp. 1181, 1191 (W.D.Mich.1995)(and cases cited therein); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 11 *Federal Practice and Procedure* § 2810.1 at 127–28 (1995). Although the Second Amended Settlement Agreement did not technically exist prior to the district

---

cases they do cite, *General Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1026–27 (6th Cir. 1994); *Haskell v. Washington Township,* 891 F.2d 132, 133 (6th Cir.1989)(order); and *Knafel*

*v. Pepsi Cola Bottlers of Akron, Inc.,* 850 F.2d 1155, 1159–60 (6th Cir.1988), set forth the general standards for Rule 54(b) certification.

court's May 20, 1997 order, it was certainly within GenCorp's power and control to revise the Settlement Agreement prior to the lower court's ruling. The district court did not abuse its discretion in denying GenCorp's motion on the basis of newly discovered evidence.

Nor can we conceive of any manifest injustice in holding GenCorp to a commitment for which it voluntarily entered into and received consideration, especially since the changed fact is an event GenCorp manufactured after the judgment was entered. A decision to reopen this case would subvert the judicial imperative of bringing litigation to an end and would serve no need other than to correct what has—in hindsight—turned out to be poor strategic decision by GenCorp. *See generally Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 174 (5th Cir.1990)(noting factors district courts should weigh in exercising their considerable discretion under Rule 59(e), including the need to bring litigation to an end and the need to render just decisions on the basis of all the facts).

### IV.

For all the foregoing reasons, the district court's grant of summary judgment to Defendants London, Central National, First State, and Lexington on the policies at issue in this appeal is **REVERSED**. The district court's grant of summary judgment on the remaining policies at issue in this appeal is **AFFIRMED**.